USA-153 Consent to Transfer of Case for Plea and Sentence (Under Rule 20)

In the United States District Court

for the Eastern District DISTRICT OF New York

UNITED STATES OF AMERICA

v

SHANE HENNEN

CRIMINAL NO. 1:25-cr-00323-LDH

Consent to Transfer of Case for Plea
and Sentence
*(Under Rule 20)*

I, Shane Hennen, defendant, have been informed that an indictment is pending against me in the above designated case. I wish to plead guilty to the offense charged, to consent to the disposition of the case in the Eastern District of Pennsylvania, in which I, Shane Hennen, am present and to waive trial in the above captioned District.

Dated: 2-25 20__ at 11:30am

*(Defendant)*

*(Witness)*

*(Counsel for Defendant)*

*(Assistant United States Attorney)*

Approved

United States Attorney for the

Eastern District of

Pennsylvania

United States Attorney for the

Eastern District of

New York

**U.S. District Court**
**Eastern District of New York (Brooklyn)**
**CRIMINAL DOCKET FOR CASE #: 1:25-cr-00323-LDH-3**

| | |
|---|---|
| Case title: USA v. Earnest et al | Date Filed: 10/16/2025 |
| Magistrate judge case number: 1:25-mj-00006-LB | Date Terminated: 09/09/2026 |

---

Assigned to: Judge LaShann DeArcy Hall

**Defendant (3)**

**Shane Hennen**
*TERMINATED: 09/09/2026*
*also known as*
Sugar
*TERMINATED: 09/09/2026*

represented by **Todd M Leventhal**
Leventhal and Associates PLLC
319 S. Third St. Suite 100
Las Vegas, NV 89101
702-472-8686
Fax: 702-472-8685
Email: mg.leventhaloffice@gmail.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

| **Pending Counts** | **Disposition** |
|---|---|
| None | |

**Highest Offense Level (Opening)**

None

| **Terminated Counts** | **Disposition** |
|---|---|
| Title 18, United States Code, Sections 1349 and 3551 et seq.- Conspiracy to Commit Wire Fraud. (1) | Rule 20 Transfer |
| 18:1349 and 3551 et seq.- Conspiracy to Commit Wire Fraud (1s) | Rule 20 Transfer |
| Title 18, United States Code, Sections 1956(h) and 3551 et seq.- Conspiracy to Commit Money Laundering. (2) | |
| 18:1956(h) and 3551 et seq.- Conspiracy to Commit Money Laundering (2s) | Rule 20 Transfer |
| 18:224,2 and 3551 et seq.- Bribery In Sporting Contests (3s) | Rule 20 Transfer |
| 18:1349 and 3551 et seq.- Honest Services Wire Fraud Conspiracy | Rule 20 Transfer |

**Highest Offense Level (Terminated)**

Felony

| **Complaints** | **Disposition** |
|---|---|
| 18:1349.F | |

---

**Plaintiff**

**USA** represented by

**David Ian Berman**
DOJ-USAO
Criminal Division
271-A Cadman Plaza East
Brooklyn, NY 11201
347-482-9644
Email: david.berman2@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Government Attorney*

**Kaitlin Teresa Farrell**
US Attorney's Office for the Eastern District of New Yo
271a Cadman Plaza East
Brooklyn, NY 11201
718-254-6072
Fax: 718-254-6076
Email: kaitlin.farrell@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Government Attorney*

**Benjamin Weintraub**
U.S. Attorney's Office
Eastern District of New York
271-A Cadman Plaza East
Brooklyn, NY 11201
718-254-6519
Email: benjamin.weintraub@usdoj.gov
*ATTORNEY TO BE NOTICED*
*Designation: Government Attorney*

| Date Filed | # | Docket Text |
|---|---|---|
| 01/11/2025 | 1 | SEALED COMPLAINT as to Shane Hennen (1). (Attachments: # 1 Sealing Cover Sheet) (FC)[1:25-mj-00006-LB] (Main Document 1 replaced on 10/23/2025) (AM). (Entered: 01/13/2025) |
| 01/11/2025 | 3 | Order to Unseal Case as to Shane Hennen. Ordered by Magistrate Judge Lois Bloom on 1/11/2025. (FC)[1:25-mj-00006-LB] (Main Document 3 replaced on 10/23/2025) (AM). (Entered: 01/13/2025) |
| 01/13/2025 | 4 | Letter *Regarding Shane Hennen (Redacted)* as to Shane Hennen (Berman, David)[1:25-mj-00006-LB] (Main Document 4 replaced on 10/23/2025) (AM). (Entered: 01/13/2025) |
| 01/31/2025 | | Minute Entry for proceedings held before Magistrate Judge Vera M. Scanlon : Arraignment as to Shane Hennen (1) Count Complaint held on 1/31/2025, Initial Appearance as to Shane Hennen held |

| | | |
|---|---|---|
| | | on 1/31/2025. (FTR Log #12;42-12;48.) AUSA Ben Weintraub present. Defendant present w/ retain counsel Todd Leventhal - to file motion to appeal pro hav vice after today's proceedings. Consent $200,000 bond with conditions. Defendant and a suretor advised of bond obligations and signed bond. Defendant remained on bond. Preliminary hearing waived. Order of excludable delay from 1/31 to 3/3125 entered. Rule 5f order read into the record. (SMY) [1:25-mj-00006-LB] (Entered: 01/31/2025) |
| 01/31/2025 | 6 | ORDER Setting Conditions of Release as to Shane Hennen (1) $200,000 bond. Ordered by Magistrate Judge Vera M. Scanlon on 1/31/2025. (SMY)[1:25-mj-00006-LB] (Main Document 6 replaced on 10/23/2025) (AM). (Entered: 01/31/2025) |
| 01/31/2025 | 7 | REDACTED $200,000 bond as to Shane Hennen to 6 1 - Order Setting Conditions of Release. (SMY) [1:25-mj-00006-LB] (Entered: 01/31/2025) |
| 01/31/2025 | 8 | ORDER TO CONTINUE - Ends of Justice as to Shane Hennen Time excluded from 1/31/25 until 3/31/25.. Ordered by Magistrate Judge Vera M. Scanlon on 1/31/2025. (SMY)[1:25-mj-00006-LB] (Main Document 8 replaced on 10/23/2025) (AM). (Entered: 01/31/2025) |
| 01/31/2025 | 9 | ORDER: This order is entered pursuant to Federal Rule of Criminal Procedure 5(f) to confirm the prosecution's disclosure obligations under Brady v. Maryland, 373 U.S. 83 (1963), and its progeny, and to summarize the possible consequences of violating those obligations. as to Shane Hennen. Ordered by Magistrate Judge Vera M. Scanlon on 1/31/2025. (SMY)[1:25-mj-00006-LB] (Main Document 9 replaced on 10/23/2025) (AM). (Entered: 01/31/2025) |
| 02/03/2025 | 10 | MOTION to Appear Pro Hac Vice Filing fee $ 200, receipt number ANYEDC-18726225 by Shane Hennen. (Leventhal, Todd)[1:25-mj-00006-LB] (Main Document 10 replaced on 10/23/2025) (AM). (Entered: 02/03/2025) |
| 03/26/2025 | 13 | ORDER TO CONTINUE - Ends of Justice as to Shane Hennen Time excluded from 3/26/25 until 5/25/25.. Ordered by Magistrate Judge Robert M. Levy on 3/26/2025. (SMY)[1:25-mj-00006-LB] (Main Document 13 replaced on 10/23/2025) (AM). (Entered: 03/27/2025) |
| 05/23/2025 | 14 | ORDER TO CONTINUE - Ends of Justice as to Shane Hennen Time excluded from 5/23/25 until 7/22/25. Ordered by Magistrate Judge James R. Cho on 5/23/2025. (FC)[1:25-mj-00006-LB] (Main Document 14 replaced on 10/23/2025) (AM). (Entered: 05/23/2025) |
| 07/22/2025 | 15 | ORDER TO CONTINUE - Ends of Justice as to Shane Hennen Time excluded from 7/22/25 until 9/20/25. Ordered by Magistrate Judge Peggy Kuo on 7/22/2025. (FC)[1:25-mj-00006-LB] (Main Document 15 replaced on 10/23/2025) (AM). (Entered: 07/22/2025) |
| 09/22/2025 | 16 | ORDER TO CONTINUE - Ends of Justice as to Shane Hennen Time excluded from 9/22/2025 until 11/21/2025.Ordered by Magistrate Judge James R. Cho on 9/22/2025. (DW).[1:25-mj-00006-LB] (Main Document 16 replaced on 10/23/2025) (AM). (Entered: 09/22/2025) |
| 10/16/2025 | 17 | SEALED INDICTMENT as to Eric Earnest (1) count(s) 1, 2, Marves Fairley (2) count(s) 1, 2, Shane Hennen (3) count(s) 1, 2, Damon Jones (4) count(s) 1, 2, Deniro Laster (5) count(s) 1, 2, Terry Rozier (6) count(s) 1, 2. (Attachments: # 1 Criminal Information Sheet, # 2 Indictment with foreperson signature, # 3 Sealing Cover Sheet) (JT) (Main Document 17 replaced on 10/23/2025) (AM). (Entered: 10/16/2025) |
| 10/21/2025 | | ORDER REASSIGNING CASE as to Shane Hennen, Eric Earnest, Marves Fairley, Damon Jones, Deniro Laster, Terry Rozier. Reassigned to Judge LaShann DeArcy Hall. Judge Rachel P. Kovner no longer assigned to the case. Please download and review the Individual Practices of the assigned Judges, located on our website. Attorneys are responsible for providing courtesy copies to judges where their Individual Practices require such. Ordered by Chief Judge Margo K. Brodie on 10/21/2025. (SDM) (Entered: 10/21/2025) |
| 10/23/2025 | 25 | Order to Unseal Indictment as to Shane Hennen, Eric Earnest, Marves Fairley, Damon Jones, Deniro Laster, Terry Rozier.. Ordered by Magistrate Judge James R. Cho on 10/23/2025. (AM) (Entered: 10/23/2025) |
| 10/28/2025 | 28 | NOTICE OF ATTORNEY APPEARANCE Benjamin Weintraub appearing for USA. (Weintraub, Benjamin) (Entered: 10/28/2025) |

| | | |
|---|---|---|
| 10/30/2025 | 32 | ORDER as to Shane Hennen: This order is entered pursuant to Federal Rule of Criminal Procedure 5(f) to confirm the prosecution's disclosure obligations under Brady v. Maryland, 373 U.S. 83 (1963), and its progeny, and to summarize the possible consequences of violating those obligations. Ordered by Magistrate Judge Taryn A. Merkl on 10/30/2025. (MLR) (Entered: 10/31/2025) |
| 10/30/2025 | 33 | Minute Entry for proceedings held before Magistrate Judge Taryn A. Merkl: Arraignment as to Shane Hennen (3) NOT GUILTY on ALL COUNTS of the indictment. A.U.S.A: Benjamin Weintraub. Todd Leventhal, Esq. ret.for deft. Rule 5f warnings given to the govt. Order of Excl. entered betw. 10/30-12/8/2025. (Status Conference set for 12/8/2025 at 4:30 PM before Judge LaShann DeArcy Hall). (Time Log #3:01-3:42). (MLR) (Entered: 10/31/2025) |
| 10/30/2025 | 34 | ORDER TO CONTINUE - Ends of Justice as to Shane Hennen-Time excluded from 10/30/2025 until 12/8/2025. Ordered by Magistrate Judge Taryn A. Merkl on 10/30/2025. (MLR) (Entered: 10/31/2025) |
| 11/03/2025 | 35 | NOTICE OF ATTORNEY APPEARANCE Kaitlin Teresa Farrell appearing for USA. (Farrell, Kaitlin) (Entered: 11/03/2025) |
| 12/08/2025 | | MINUTE ENTRY AND ORDER: A status conference as to Defendants Eric Earnest, Marves Fairley, Shane Hennen, Damon Jones, Deniro Laster and Terry Rozier was held before Judge LaShann DeArcy Hall on December 8, 2025. Assistant United States Attorneys Benjamin Weintraub and Kaitlin Farrell appeared on behalf of the Government. David Gray appeared on behalf of Mr. Earnest, who was also present. Eric Siegle appeared on behalf of Mr. Fairley, who was also present. Todd Leventhal appeared on behalf of Mr. Hennen, who was also present. Kenneth Montgomery appeared on behalf of Mr. Jones, who was also present. Matthew Corcoran appeared on behalf of Mr. Laster, who was also present. James Trusty appeared on behalf of Mr. Rozier, who was also present. A status conference shall be held before Judge LaShann DeArcy Hall on March 3, 2026, at 3:00 p.m., in Courtroom 4H North. Time is excluded to March 3, 2026, in the interest of justice and to allow for additional plea negotiations and ongoing discovery. *See* 18 U.S.C. § 3161(h)(7). Ordered by Judge LaShann DeArcy Hall on 12/8/2025. (Court Reporter Stacy Mace.) (CG) (Entered: 12/11/2025) |
| 12/11/2025 | 74 | MOTION for Protective Order by USA as to Shane Hennen, Eric Earnest, Marves Fairley, Damon Jones, Deniro Laster, Terry Rozier. (Attachments: # 1 Exhibit) (Weintraub, Benjamin) (Entered: 12/11/2025) |
| 12/29/2025 | 86 | STIPULATION & PROTECTIVE ORDER GOVERNING DISCOVERY: Motion for Protective Order 74 , as to Eric Earnest (1), Marves Fairley (2), Shane Hennen (3), Damon Jones (4), Deniro Laster (5), Terry Rozier (6), is Granted. Ordered by Judge LaShann DeArcy Hall on 12/23/2025. (Recv'd. on 12/29/25). (MLR) (Entered: 12/29/2025) |
| 03/03/2026 | | MINUTE ENTRY AND ORDER: A status conference as to Defendants Eric Earnest, Marves Fairley, Shane Hennen, Damon Jones, Deniro Laster and Terry Rozier was held before Judge LaShann DeArcy Hall on March 3, 2026. Assistant United States Attorneys Benjamin Weintraub, Kaitlin Farrell and David Berman appeared on behalf of the Government. Peter Brill appeared on behalf of Mr. Earnest, who was also present. Eric Siegle appeared on behalf of Mr. Fairley, who was also present. Todd Leventhal appeared on behalf of Mr. Hennen, who was also present. Kenneth Montgomery appeared on behalf of Mr. Jones, who was also present. Matthew Corcoran appeared on behalf of Mr. Laster, who was also present. James Trusty appeared on behalf of Mr. Rozier, who was also present. A status conference shall be held before Judge LaShann DeArcy Hall on May 15, 2026, at 3:00 p.m., in Courtroom 4H North. Time is excluded to May 15, 2026, in the interest of justice and to allow for additional plea negotiations and ongoing discovery. *See* 18 U.S.C. § 3161(h)(7). Ordered by Judge LaShann DeArcy Hall on 3/3/2026. (Court Reporter Anthony Frisolone.) (CG) (Entered: 03/25/2026) |
| 05/08/2026 | | SCHEDULING ORDER: The status conference as to Defendant's Eric Earnest, Marves Fairley, Shane Hennen, Deniro Laster and Terry Rozier scheduled for May 15, 2026, is ADJOURNED to June 10, 2026, at 3:30 p.m. The parties are directed to file a joint status letter no later than May 14, 2026, indicating whether they consent to the exclusion of time until June 10, 2026. Ordered by Judge LaShann DeArcy Hall on 5/8/2026. (CG) (Entered: 05/08/2026) |

| | | |
|---|---|---|
| 05/14/2026 | 98 | Letter *re Joint Status Update, exclusion of time* as to Shane Hennen, Eric Earnest, Marves Fairley, Damon Jones, Deniro Laster, Terry Rozier (Farrell, Kaitlin) (Entered: 05/14/2026) |
| 05/28/2026 | 101 | SUPERSEDING INDICTMENT(S-1) as to Eric Earnest (1) count(s) 1s, 2s, Shane Hennen (3) count(s) 1s, 2s, 3s, 4s, Deniro Laster (5) count(s) 1s, 2s, 3s, 4s, Terry Rozier (6) count(s) 1s, 2s, 3s, 4s. (RG) (RG). (Additional attachment(s) added on 5/29/2026: # 1 Indictment with foreperson signature) (RG). (Entered: 05/29/2026) |
| 06/10/2026 | 107 | Minute Entry for proceedings held before Magistrate Judge Lara K. Eshkenazi: Arraignment as to Shane Hennen (3) Count 1s,2s,3s,4s held on 6/10/2026. Plea entered by Shane Hennen: NOT Guilty on ALL COUNTS of the superseding indictment. AUSA: David Berman. David Gray standing in for retained counsel Todd Leventhal for deft.. Bond cont'd. for deft. (Status Conference set for 6/10/2026 at 3:30 PM before Judge LaShann DeArcy Hall). (Time Log #: 2:30-2:33) (MLR) (Entered: 06/11/2026) |
| 06/10/2026 | | MINUTE ENTRY AND ORDER: A status conference as to Defendants Eric Earnest, Shane Hennen, Deniro Laster, and Terry Rozier was held before Judge LaShann DeArcy Hall on June 10, 2026. Assistant United States Attorneys Benjamin Weintraub, Kaitlin Farrell and David Berman appeared on behalf of the Government. Peter Brill appeared on behalf of Mr. Earnest, who was also present. David Gray appeared on behalf of Mr. Hennen, who was also present. Matthew Corcoran appeared on behalf of Mr. Laster, who was also present. James Trusty appeared on behalf of Mr. Rozier, who was also present. Trial shall commence on February 8, 2027, at 9:30 a.m. before Judge LaShann DeArcy Hall in Courtroom 4H North. A status conference shall be held before Judge LaShann DeArcy Hall on August 11, 2026, at 2:00 p.m., in Courtroom 4H North. Time is excluded to February 8, 2027, in the interest of justice and to allow for additional plea negotiations and ongoing discovery. *See* 18 U.S.C. § 3161(h)(7). Ordered by Judge LaShann DeArcy Hall on 6/10/2026. (Court Reporter Michele Lucchese.) (CG) (Entered: 06/26/2026) |
| 06/22/2026 | 114 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Shane Hennen, Eric Earnest, Deniro Laster, Terry Rozier held on 6/10/2026, for hearing type status conference, before Judge LaShann DeArcy Hall. Court Reporter/Transcriber Michele Lucchese, Telephone number 718-613-2272. Email address: MLuccheseEDNY@gmail.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request - Transcript" located under "Other Filings - Other Documents". Redaction Request due 7/13/2026. Redacted Transcript Deadline set for 7/23/2026. Release of Transcript Restriction set for 9/21/2026. (Lucchese, Michele) (Entered: 06/22/2026) |
| 08/11/2026 | | Minute Entry And Order: A status conference as to Defendants Eric Earnest, Shane Hennen, Deniro Laster, and Terry Rozier was held before Judge LaShann DeArcy Hall on August 11, 2026. Assistant United States Attorneys Benjamin Weintraub, Kaitlin Farrell, and David Berman appeared on behalf of the Government. Peter Brill appeared on behalf of Mr. Earnest, who was also present. David Gray appeared on behalf of Mr. Hennen, who was also present. Matthew Corcoran appeared on behalf of Mr. Laster, who was also present. David Markus, Lauren Krasnoff appeared on behalf of Mr. Rozier, who was also present. For the reasons stated on the record, Defendant Rozier's motion 125 to transfer venue was DENIED. For the reasons stated on the record, Defendant Laster was remanded to custody. (Court Reporter: Michele Lucchese) (MLR) (Entered: 08/20/2026) |
| 08/21/2026 | 143 | Letter *Requesting Order Directing the Clerk of Court to Release Trial Subpoena Returns* as to Shane Hennen, Eric Earnest, Marves Fairley, Damon Jones, Deniro Laster, Terry Rozier (Berman, David) (Entered: 08/21/2026) |
| 09/08/2026 | 146 | Letter *Regarding Transfer and Guilty Plea* as to Shane Hennen (Berman, David) (Entered: 09/08/2026) |
| 09/09/2026 | 147 | CONSENT TO TRANSFER JURISDICTION (Rule 20) to Pennsylvania-Eastern District Counts closed as to Shane Hennen (3) Count 1,1s,2,2s,3s,4s. (MLR) (Entered: 09/09/2026) |
| 09/09/2026 | 148 | Notice to Pennsylvania-Eastern District of a Rule 20 Consent to Transfer as to Shane Hennen. Docket sheet and documents attached. (If you require certified copies of any documents, please send a request to [InterDistrictTransfer_NYED@nyed.uscourts.gov]. If you wish to designate a different |

| | | |
|---|---|---|
| | | email address for future transfers, send your request to InterDistrictTransfer_TXND@txnd.uscourts.gov.) (MLR) (Entered: 09/09/2026) |

DGR:KTF/BLW/DIB
F. #2024R00288

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

- against -

SHANE HENNEN,

Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

**TO BE FILED UNDER SEAL**

COMPLAINT AND AFFIDAVIT IN SUPPORT OF APPLICATION FOR ARREST WARRANT

(18 U.S.C. §§ 1349, 1956(a)(1)(A)(i), 2 and 3551 et seq.)

Case No. 25-mj-00006

EASTERN DISTRICT OF NEW YORK, SS:

RUSSELL LANTIER, being duly sworn, deposes and states that he is a Special Agent with the Federal Bureau of Investigation ("FBI"), duly appointed according to law and acting as such.

In or about and between January 2024 and March 2024, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant SHANE HENNEN, together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud Betting Company 1, an online sports betting company the identity of which is known to your affiant, and to obtain money and property from Betting Company 1 by means of one or more materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce writings, signs, signals, pictures and sounds, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

In or about January 2024, within the Eastern District of New York and elsewhere, the defendant SHANE HENNEN, together with others, did knowingly and intentionally conduct and attempt to conduct one or more financial transactions, to wit: one or more transactions affecting interstate and foreign commerce and involving the use of a financial institution that is engaged in, and the activities of which affect, interstate and foreign commerce, which transactions in fact involved the proceeds of one or more specified unlawful activities, to wit: (i) bribery in sporting contests, in violation of Title 18, United States Code, Section 224; and (ii) wire fraud, in violation of Title 18, United States Code, Section 1343, knowing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, with the intent to promote the carrying on of the specified unlawful activities, contrary to Title 18, United States Code, Section 1956(a)(l)(A)(i).

(Title 18, United States Code, Sections 1956(a)(l)(A)(i), 2 and 3551 et seq.)

The source of your deponent's information and the grounds for his belief are as follows:[1]

1. I am a Special Agent with the FBI and have been involved in the investigation of cases involving money laundering, bribery in sporting contests, wire fraud, conspiracy and illegal gambling. I am familiar with the facts and circumstances set forth below from, among other things, my participation in the investigation; my review of the investigative file; and from reports of other law enforcement officers involved in the investigation.

2. As set forth more fully below, since in or about March 2024, the FBI has been investigating, among other things, a fraudulent scheme to "fix" the performance of certain

[1] Because the purpose of this Complaint is to set forth only those facts necessary to establish probable cause to arrest, I have not described all the relevant facts and circumstances of which I am aware.

professional athletes in specific games in order to make profitable bets on the athlete's performance in that game (the "Fraudulent Wager Scheme"). As part of the scheme, co-conspirators obtained inside information concerning things like an athlete's pre-planned intent to purposely withdraw from a game, and thereby depress the athlete's performance in that game, co-conspirators in the scheme placed fraudulent bets that the athlete would underperform in the game. Armed with their inside information concerning the athlete's intent to purposely withdraw, many of the bettors' fraudulent prop bets paid out successfully and the proceeds of their scheme were subsequently laundered through the U.S. financial system.

## I. The Defendant and Relevant Entities and Individuals

3. The defendant SHANE HENNEN was a citizen of the United States and a resident of Las Vegas, Nevada.

4. Financial Institution 1, the identity of which is known to the affiant, was a financial institution based in New York, New York.

5. The National Basketball Association ("NBA") was a professional basketball league in North America comprised of 30 teams. The NBA maintained a code of conduct applicable to its players and which, among other things, prohibited wagering in connection with NBA games.

6. Betting Company 1, the identity of which is known to the affiant, was a sportsbook that operated both physical sportsbooks and an online platform that offer sports betting relating to, among other things, NBA games and individual players' statistical performances in connection with NBA games. Betting Company 1 operated a physical sportsbook within a hotel & casino (the "Casino") in Atlantic City, New Jersey.

7. NBA Player 1, whose identity is known to the affiant, was a citizen of the United States and a professional basketball player in the NBA, including during the 2023-2024 NBA season. On July 10, 2024, NBA Player 1 pled guilty in the Eastern District of New York to a one-count information charging him with conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349, in connection with the Fraudulent Wager Scheme. See 24-CR-270 (LDH).

8. Co-Conspirator 1, whose identity is known to the affiant, was a citizen of the United States and a resident of Queens, New York. Co-Conspirator 1 has pled guilty in the Eastern District of New York to a one-count information charging him with conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349, in connection with the Fraudulent Wager Scheme.

9. Co-Conspirator 2, whose identity is known to the affiant, was a citizen of the United States and a resident of Brooklyn, New York. A grand jury sitting in the Eastern District of New York previously returned an indictment charging Co-Conspirator 2 with conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349, in connection with the Fraudulent Wager Scheme.

10. Co-Conspirator 3, Co-Conspirator 4 and Co-Conspirator 5, whose identities are known to your affiant, were citizens of the United States.

## II. Background on Sports Betting

11. In 1992, following several high-profile sports-betting scandals, Congress passed the federal Professional and Amateur Sports Protection Act ("PASPA"), 28 U.S.C. § 3702, which banned all but four states from sponsoring, authorizing, operating, or regulating sports wagering. The four excepted states—Nevada, Oregon, Delaware and Montana—had existing sports wagering regimes that PASPA grandfathered in.

12. In May of 2018, following years of litigation between the State of New Jersey—which desired to legalize sports betting—and several major American professional and college sports leagues, the United States Supreme Court struck down PASPA as unconstitutional. In the ensuing six years, sports betting, and particularly online sports betting, became legal in over 35 states.

13. In recent years, online sportsbooks like Betting Company 1 made it possible for bettors to open an online account and place wagers using their phone. Bettors could generally wager on the moneyline, spread, over/under, parlays, props and futures.

14. A "prop," or proposition bet, was a bet placed on an individual player's performance, rather than on the outcome of the game. A prop was a bet made regarding the occurrence or non-occurrence during a game of an event not directly affecting the game's final outcome. For example, a betting platform could offer users a wager that a certain player would score more (referred to as betting the "over") or fewer (referred to as betting the "under") points than a certain number of points designated by the betting platform for a given game. In addition to adult professional athletes who compete on team sports, prop bets could be placed on college students, individual athletes, and child professional athletes (i.e., professional athletes who are under the age of 18).

15. A "parlay" bet or a "parlay" was a bet comprised of two or more individual bets. In order for a bettor to win a parlay, each bet, or "leg," within the parlay had to win.

16. A moneyline bet was a wager placed on a game's outcome.

17. A futures bet was a bet on the outcome of a multi-stage event such as a season or a tournament. Futures could refer to either team or player markets, such as which team would win their division, league, or championship.

18. Before placing any bet, all bettors wagering through Betting Company 1 had to agree to its terms of use (the "Terms of Use"), which both provided, in sum, substance and in part, that users were prohibited from wagering in connection with sports contests or individual players' statistical performances if the users had access to any pre-release, confidential information or other information that was not available to all other wagerers, including any information provided by a professional athlete, such as non-public injury information. The Terms of Use also prohibited individuals from using other individuals' accounts to place wagers.

III. The Fraudulent Wager Scheme

A. Summary

19. As described more fully below, the defendant SHANE HENNEN, together with others, conspired to place fraudulent "under" prop bets on NBA Player 1's performance in the January 26 and March 20 Games, knowing in advance that NBA Player 1 planned to withdraw from those games for purported health reasons, thus rendering such prop bets successful. Thereafter, HENNEN, together with others, laundered the proceeds derived from that fraudulent scheme through one or more financial transactions designed, in whole or in part, to conceal the criminal origin of those funds.

B. The January 26 Game

20. As demonstrated in text messages, mobile application records, and wire transfer records, among other evidence, by the beginning of 2024, NBA Player 1 had amassed

significant gambling debts to, among others, Co-Conspirator 2, who then encouraged NBA Player 1to clear those debts by engaging in the NBA Player 1 "special," i.e., withdrawing from certain games prematurely to ensure that under prop bets on NBA Player 1's performance were successful.

21. On January 22, 2024—four days before the January 26 Game— NBA Player 1 sustained a purported eye injury during an NBA game (the "January 22 Game"). NBA Player 1 was evaluated by a doctor after the January 22 Game and diagnosed with a corneal abrasion. However, NBA Player 1 did not subsequently complain about the purported injury and was not placed on the NBA's injury list.

22. On or about January 23, 2024, Co-Conspirator 1 texted the defendant SHANE HENNEN a screenshot of a chat between Co-Conspirator 1 and two of Co-Conspirator 1's contacts—Co-Conspirator 2 and NBA Player 1, respectively—that occurred on January 22, 2024. In the chat, NBA Player 1 messaged Co-Conspirator 2 and Co-Conspirator 1 during the January 22 Game and stated the following:

| | |
|---|---|
| NBA Player 1: | I went back to locker room to get eye checked on |
| NBA Player 1: | Idk if imma play much more |
| NBA Player 1: | I'm<br>Not starting second half |
| NBA Player 1: | But if it's garbage time I will shoot a million shots." |

I believe that in this exchange NBA Player 1 was advising Co-Conspirator 2 and Co-Conspirator 1 about his status and his expectation he may not play the rest of the game, but that, if he did in "garbage time," he would take a large number of shots. Based on my participation in the investigation to date, I am aware that this type of information is highly relevant to bettors interested in placing prop bets on an NBA game.

23. Text message communications obtained during the course of the investigation show that three days after this exchange, and hours before the January 26 Game, NBA Player 1 messaged, among others, Co-Conspirator 1 and Co-Conspirator 2, that NBA Player 1 would be removing himself early from the January 26 Game claiming that he was injured.

24. Text message communications obtained during the investigation show that Co-Conspirator 1 subsequently messaged the defendant SHANE HENNEN the inside information concerning NBA Player 1's intent to remove himself early from the January 26 Game, with the understanding that HENNEN would wager based on such information.

25. Specifically, on January 26, 2024, Co-Conspirator 1 messaged the defendant SHANE HENNEN to "call 911." At approximately that same time, Co-Conspirator 1 forwarded a message to HENNEN from NBA Player 1. The forwarded message read, "Hit unders for the big numbers. I told [Co-Conspirator 2] no blocks no steals. I'm going to play first 2-3 minute stint off the bench then when I get subbed out tell them my eye killing me again." Based on my participation in the investigation to date, I believe the forwarded message reflected NBA Player 1's intent to purposefully underperform during the January 26, 2024 game. NBA Player 1 relayed he would have no blocks or steals; play the first "2-3 minutes" as a substitute from the bench and then remove himself from the game by claiming eye pain.

26. After forwarding the messages from NBA Player 1, Co-Conspirator 1 then sent the defendant SHANE HENNEN two screenshots that I recognize to be betting slips for wagers placed on NBA Player 1's performance during the January 26 Game which specifically wagered in accordance with his expected underperformance during the game by taking the "under" position on each. Among them included a $29,382 parlay wager that, among other

things, bet the "under" on NBA Player 1's rebounds and points, which bet, if successful, would pay out approximately $103,387.

27. After receiving the above-described inside information regarding NBA Player 1's intended underperformance, the defendant SHANE HENNEN, acting through proxies or straw bettors, placed wagers on NBA Player 1 "unders" in connection with NBA Player 1's performance during the January 26 Game.

28. For example, at approximately 6:13 p.m. EST on January 26, 2024 Co-Conspirator 3 texted the defendant SHANE HENNEN a screenshot of a betting slip for a wager placed by Co-Conspirator 3 through Betting Company 1 totaling $3,700 on NBA Player 1 "under rebounds" in connection with NBA Player 1's performance during the January 26 Game. The screenshot is depicted below.




29. Hours later, shortly after NBA Player 1 removed himself from the January 26 Game, Co-Conspirator 3 texted the defendant SHANE HENNEN: "You are +1114." Through that message, Co-Conspirator 3 was telling HENNEN that, as a result of the bet that Co-Conspirator 3 had placed on NBA Player 1's unders, HENNEN's account had realized profits and had a positive balance of $1,114. Based on my training, experience and participation in this investigation, I know it is common for individuals such as HENNEN who place bets through proxies or straw bettors to have running accounts and tabs with their proxies, which tabs reflect whether the bettor's account is profitable (i.e., in the green, or in the positive) or unprofitable (i.e., in the red, or in the negative) at any given time.

30. Thereafter, the defendant SHANE HENNEN requested that Co-Conspirator 3 send $1,114 to HENNEN's account at Financial Institution 1. Co-Conspirator 3

then texted HENNEN: "Money sent 1114 please confirm thanks," to which HENNEN responded: "received." A review of records provided by Financial Institution 1 show that a financial transaction between Co-Conspirator 3 and HENNEN totaling $1,114 was processed by Financial Institution 1 on or about January 28, 2024.

31. On January 26, 2024, the defendant SHANE HENNEN texted Co-Conspirator 4 "We got lucky," to which Co-Conspirator 4 responded by stating "wish me luck" and sending HENNEN a photo of a betting slip for a wager totaling $16,560 placed on NBA Player 1 "under points" in connection with NBA Player 1's performance during the January 26 Game, as shown below. In response, HENNEN texted Co-Conspirator 4 "We at 16k," which, based on my training, experience and participation in this investigation, I know refers to Co-Conspirator 4's above-described wager totaling $16,560.

32. NBA Player 1 was ultimately not on the NBA's injury list prior to the January 26 Game. NBA Player 1 entered the January 26 Game midway through the first quarter. Consistent with his prior statements to co-conspirators, after playing just four minutes and recording zero points, three rebounds and one assist, NBA Player 1 removed himself from the game after he complained to team officials that he reaggravated the above-described eye injury. Video footage of the January 26 Game neither shows any contact with NBA Player 1's eyes, nor any apparent reaggravation of the eye injury. NBA Player 1 did not subsequently complain to team officials about the purported eye injury after the January 26 Game and played in his team's next game two days later.

33. NBA Player 1's performance in several statistical categories during the January 26 Game was under the designated amounts set by betting companies, including Betting Company 1, in their prop bets related to NBA Player 1. Thus, bettors who wagered the "under"

on prop bets related to NBA Player 1's performance for the January 26 Game won those bets, including Co-Conspirator 3 and Co-Conspirator 4 as described above.

C. The March 20 Game

34. Text message communications obtained during the course of the investigation show that, prior to the March 20 Game, NBA Player 1 told Co-Conspirator 1 and Co-Conspirator 2, in sum and substance, that NBA Player 1 would be removing himself early from the March 20 Game, claiming that he was ill.

35. Text message communications, betting records and surveillance footage, among other evidence, show that on March 20, 2024, Co-Conspirator 1, Co-Conspirator 2 and other co-conspirators all met at the Casino in Atlantic City to place bets on NBA Player 1. Once at the Casino, Co-Conspirator 2 and Co-Conspirator 1, together with other co-conspirators, placed the first of their several bets on NBA Player 1 before the March 20 Game began.

36. Shortly before arriving at the Casino, text message communications obtained during the course of the investigation show that Co-Conspirator 1 and the defendant SHANE HENNEN had the following text exchange at approximately 2:53 p.m. EST:

CC-1: Please don't leak it

HENNEN: I'm not

Based on my training, experience and participation in this investigation, I know that Co-Conspirator 1's request that HENNEN "Please don't leak it" refers to Co-Conspirator 1 asking HENNEN not to share with others the inside information that NBA Player 1 would be removing himself early from the March 20 Game.

37. Among other evidence, text message communications and betting records show that the defendant SHANE HENNEN then likely provided the inside information described

in paragraph 36, that is, that NBA Player 1 would be removing himself early from the March 20 Game, to various co-conspirators, thereby enabling them to place fraudulent wagers on NBA Player 1's unders.

38. For example, at approximately 3:28 p.m. EST on March 20, 2024, Co-Conspirator 5 texted the defendant SHANE HENNEN: "Yo did you try calling back via FaceTime," to which HENNNEN responded "Yes." Betting Company 1 records show that at approximately 7:28 p.m. EST on March 20, 2024, Co-Conspirator 5 placed a wager totaling $2,400 (to profit $2,000) on NBA Player 1 "under" points in connection with the March 20 Game.

39. During the March 20 Game, after playing just three minutes, and recording zero points, two rebounds and zero assists, NBA Player 1 removed himself from the game after he complained to team officials of feeling ill. NBA Player 1 did not reenter the game. NBA Player 1 was not subsequently placed on the NBA's injury list and played in his team's next game on March 22, 2024.

40. NBA Player 1's performance in many statistical categories during the March 20 Game was under the designated amounts set by betting companies, including Betting Company 1, in their prop bets related to NBA Player 1. Thus, several bettors, including, among others, Co-Conspirator 5, who wagered the "under" on prop bets related to NBA Player 1's performance for the March 20 Game won those bets.

WHEREFORE, your deponent respectfully requests that the defendant SHANE HENNEN be dealt with according to law.

Russell Lantier

RUSSELL LANTIER
Special Agent
Federal Bureau of Investigation

Sworn to before me telephonically this 11th day of January, 2025

Lois Bloom

THE HONORABLE LOIS BLOOM
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

**Sealed documents are no longer available in CM/ECF or via PACER.**

**Please contact the court directly to request access to the document.**

**Reference for court use only**

https://storage.gtwy.dcn:8443/v1/file/nyed.4859117606.42515650.130882.json

DIB
F.# 2024R00288

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

- against -

SHANE HENNEN,

Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - X

O R D E R

25-mj-00006

Upon the application of CAROLYN POKORNY, Acting United States Attorney for the Eastern District of New York, by Assistant United States Attorney David I. Berman, for an order unsealing the complaint and arrest warrant in the above-captioned matter.

WHEREFORE, it is ordered that the complaint and arrest warrant in the above-captioned matter be unsealed.

Dated: Brooklyn, New York
January 12, 2025

Lois Bloom
HONORABLE LOIS BLOOM
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

KTF:BW/DIB
F. #2024R00288

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

January 13, 2025

Robert Knief
Assistant United States Attorney
United States Attorney's Office
District of Nevada

Re: United States v. Shane Hennen
Docket No. 25-MJ-06

Dear Assistant United States Attorney Knief:

The undersigned respectfully requests that your Office file this letter in connection with the above-captioned matter in support of the government's application for a detention hearing, pursuant to 18 U.S.C. § 3142(f)(2), and the detention of the defendant Shane Hennen, who will be presented on a complaint (the "Complaint") charging him with wire fraud conspiracy and money laundering, in violation of Title 18, United States Code, Sections 1349 and 1956. As described below, in the Complaint, the defendant is alleged to have helped orchestrate a fraudulent sports wagering scheme relating to a former National Basketball Association ("NBA") player identified in the Complaint as NBA Player 1. Given (1) the defendant's means and motive to evade detection by the government, creating a serious risk of flight, evidenced by the defendant's attempted flight after being alerted of the government's investigation, and (2) the strength and nature of the government's case, detention pending trial is the only means to secure his appearance in court.

## I. Factual Background

As described in detail in the Complaint, in January and March 2024, the defendant is alleged to have been a co-conspirator of a fraudulent wager scheme involving NBA Player 1. As alleged in the Complaint, in sum and substance, NBA Player 1 agreed to withdraw from NBA games early enabling co-conspirators, including an individual identified as Co-Conspirator 1 and the defendant Shane Hennen, to place fraudulent wagers on NBA Player 1 netting them potentially millions of dollars in profits. As alleged in the Complaint, the defendant used a network of proxies and straw bettors to place fraudulent bets on NBA Player 1 and launder the illicit proceeds.

[redacted]

[redacted]

On January 8, 2025, the defendant purchased a one-way ticket to Colombia, connecting through Panama, which was scheduled to depart from Harry Reid International Airport in Las Vegas, Nevada ("HRI") on January 12, 2025—just days before the January 15 Deadline. The defendant was arrested in connection with the Complaint at HRI as he attempted to board the above-referenced flight to Panama. During a search incident to the defendant's arrest, law enforcement agents found on the defendant multiple cell phones and just under $10,000 in cash. Upon arrest, the defendant also stated to law enforcement agents, unprompted, that he was traveling to Colombia to purportedly seek dental treatment.

## II. The Defendant's Criminal History

The defendant has a significant criminal history dating back years. In May 2006, the defendant was charged with possession of a firearm without a license, disorderly conduct, engaging in illegal conduct relating to gambling devices, engaging in illegal conduct relating to facsimile (i.e., replica or toy) bombs and possession of an instrument of crime, all Pennsylvania state misdemeanors. In 2007, he pleaded guilty to various of these crimes and was sentenced to six months' probation.

In 2009, the defendant was charged with aggravated assault, a felony, and reckless endangerment, a misdemeanor. In 2011, the defendant pleaded guilty to aggravated assault and was sentenced to 18 months' imprisonment and four years' probation.

---

[1] The government respectfully requests that this letter be filed under seal given that it describes [redacted]

In 2011, the defendant pleaded guilty to: (i) possession with intent to distribute less than 500 grams of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) and (ii) conspiracy to possess with intent to distribute more than five kilograms of cocaine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(ii) and 846. See Judgment, United States v. Hennen, et al., 09-CR-348 (W.D. Pa. 2009). He was sentenced to two concurrent terms of 30 months' imprisonment and two concurrent terms of supervised release of three and four years. See id. Based upon records provided to the government from law enforcement, the government understands that after the defendant's release from prison, the court revoked the defendant's supervised release due to non-compliance, and resentenced him to 30 days' imprisonment.

## III. Legal Standard

Under the Bail Reform Act, Title 18, United States Code, Section 3141 et seq., federal courts are empowered to order a defendant's detention pending trial upon a determination that "no condition or combination of conditions would reasonably assure the appearance of the person as required and the safety of any other person and the community[.]" 18 U.S.C. § 3142(e).

A finding of risk of flight need only be based on a preponderance of the evidence. See United States v. Keeton, No. 20-10162, 2020 WL 4805479, at *1 (9th Cir. June 17, 2020); United States v. Boustani, 932 F.3d 79, 81 (2d Cir. 2019); United States v. Motamedi, 767 F.2d 1403, 1406 (9th Cir. 1985) ("In the trial court and in this court, the Government must establish risk of flight by a clear preponderance of the evidence, not by the higher standard of clear and convincing evidence."). In meeting its burden, the government is "not…bound by the rules of evidence … and may proceed by proffer." See United States v. Williams, 654 Fed. Appx. 3, 3 (2d Cir. 2016) (citing Ferranti, 66 F.3d at 542); see also United States v. Young, No. 01-CR-4011, 2014 WL 6601939, at *2 (N.D. Cal. Nov. 18, 2014) (ordering the defendant detained after "having considered the proffers by the parties and the probation officer, and the arguments of counsel"); United States v. Hardeman, No. 3-08-70765, 2008 WL 4891048, at *1 (N.D. Cal. Nov. 12, 2008) ("Having considered the parties' proffers, and the pretrial services report, I find that the government has met its burden of showing by a preponderance of the evidence that the defendant presents a risk of flight.").

Whether detention is sought on the basis of flight or dangerousness, the Bail Reform Act lists four factors to be considered in the detention analysis: (1) the nature and circumstances of the crimes charged; (2) the history and characteristics of the defendant, including whether the defendant is currently on probation, parole, or other release; (3) the seriousness of the danger posed by the defendant's release; and (4) the evidence of the defendant's guilt. See 18 U.S.C. § 3142(g); see also United States v. Jacobson, 502 F. App'x 31, 32 (2d Cir. 2012). Where the evidence of guilt is strong, it provides "a considerable incentive to flee." Millan, 4 F.3d at 1046; see also United States v. Palmer-Contreras, 835 F.2d 15, 18 (1st Cir. 1987) (per curiam) (where "the evidence against defendants is strong, the incentive for relocation is increased"); United States v. Super, No. 23-CR-05233, 2023 WL 5952715, at *3 (W.D. Wash. Sept. 13, 2023) (in context of pre-trial detention The evidence here is both relevant and necessary to assess what risk he poses to the community and the risk of flight.").

Where a judicial officer concludes after a hearing that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community, such judicial officer shall order the detention of the person before trial." 18 U.S.C. § 3142(e)(1).

## IV. The Defendant Should Be Detained Pending Trial

As described below, the government has met its burden of establishing the defendant's risk of flight sufficient to require his detention pending trial. In particular, courts consistently hold that where, like here, a defendant has the means and motive to disappear and escape answering for his crimes, detention pending trial is warranted. See, e.g., United States v. Williams, 654 F. App'x 3, 4 (2d Cir. 2016) (affirming order of detention based on defendant's ability "to evade oversight and detection from government agents").

First, that the defendant, in fact, attempted to flee the country just days before the January 15 Deadline demonstrates that there is a serious and substantial risk that the defendant will not return to court. See, e.g., United States v. Muhtorov, 702 F. App'x 694, 696 (10th Cir. 2017) (pretrial detention was appropriate where the defendant was "arrested at the . . . airport en route to Istanbul, Turkey. He had purchased a one-way ticket"); United States v. Molina, No. 11-CR-528, 2012 WL 3564013, at *2 (S.D.N.Y. Aug. 16, 2012) (defendant was detained pending trial where, among other things, he was found in possession of multiple cell phones and a large sum of cash).

Second, the defendant's motive to flee is obvious—the proof of his guilt is overwhelming, and, particularly given his substantial criminal history, he may ultimately face up to two decades in prison upon conviction. Among other evidence, witnesses, phone records, financial records and betting records confirm that the defendant orchestrated and participated in numerous fraudulent wager schemes, which, among other things, resulted in potentially millions of dollars' worth of illicit profits and money laundering transactions. As a result of this evidence of the defendant's guilt, the defendant has considerable incentive to flee—counseling strongly against his release under any conditions. See Millan, 4 F.3d at 1046; Palmer-Contreras, 835 F.2d at 18; Super, 2023 WL 5952715, at *3.

Third, the defendant's extraordinary financial resources and access to a network of co-conspirators across the country continue to provide him with a means to flee and to do so undetected, independently warranting detention. See, e.g., United States v. Maxwell, 510 F. Supp. 3d 165, 174 (S.D.N.Y. 2020) (detention was appropriate where "the Defendant's extraordinary financial resources ,. . . continue to provide her the means to flee the country and to do so undetected"); United States v. Hoover, No. CR-14-554, 2014 WL 2094201, at *5 (D. Ariz. May 20, 2014) (detention was appropriate where the defendant had the "financial means and travel expertise to effectuate a 'strong incentive to flee'"). The government has developed substantial evidence that the defendant has conducted or caused to be conducted illicit financial transactions and fraudulent sports wagers totaling millions of dollars, including through a network of proxies and straw bettors located across the country, such as his co-conspirators

described in the Complaint. The government has no reason doubt that the defendant will leverage these same co-conspirators to assist him with fleeing from prosecution.

Finally, the defendant's personal history illustrates that his substantial risk of flight cannot be mitigated by stringent bail requirements. His criminal history is substantial, longstanding, and varied, and demonstrates an inability to comply with the law or court rules. As just one example, a federal judge in Pennsylvania found it necessary to revoke his supervised release following a term of imprisonment for a serious drug offense.

Put simply, because there is a serious and substantial risk that the defendant will not return to court, he must be detained pending trial.

V. Conclusion

For all the foregoing reasons, the government respectfully submits that the defendant should be detained.

Respectfully submitted,

CAROLYN POKORNY
Acting United States Attorney

By: /s/ David I. Berman
Kaitlin T. Farrell
Benjamin Weintraub
David I. Berman
Assistant U.S. Attorney
(718) 254-6167

cc: Clerk of Court (by Email and ECF)
Defense Counsel (by ECF)

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-v-

SHANE HENNEN

**APPLICATION AND**
**ORDER OF EXCLUDABLE DELAY**

Case No. 25-MJ-006

The United States of America and the defendant hereby jointly request that the time period from 1/31/25 to 3/31/25 be excluded from the computation of the time period within which

(X) an information or indictment must be filed, or (XW)
( ) trial of the charges against defendant must commence. (XC)

The parties seek the exclusion of the foregoing period because

(X) they are engaged in plea negotiations, which they believe are likely to result in a disposition of this case without trial, and they require an exclusion of time in order to focus efforts on plea negotiations without the risk that they would not, despite their diligence, have reasonable time for effective preparation for trial,
( ) they need additional time to prepare for trial due to the complexity of case,
( ) ______________________________.

The defendant states that he/she has been fully advised by counsel of his/her rights guaranteed under the Sixth Amendment to the Constitution; the Speedy Trial Act of 1974, 18 U.S.C. §§ 3161-74; the plan and rules of this Court adopted pursuant to that Act; and Rule 50(b) of the Federal Rules of Criminal Procedure. The defendant understands that he/she has a right to be tried before a jury within a specified time not counting periods excluded.

Defendant

For U.S. Attorney, E.D.N.Y.

Counsel for Defendant

The joint application of the United States of America and the defendant having been heard at a proceeding on the date below, the time period from 1/31/25 to 3/31/25 is hereby excluded in computing the time within which (✓) an information or indictment must be filed or ( ) trial must commence. The Court finds that this exclusion of time serves the ends of justice and outweigh the interests of the public and the defendant in a speedy trial for the reasons discussed on the record and because

(✓) given the reasonable likelihood that ongoing plea negotiations will result in a disposition of this case without trial, the exclusion of time will allow all counsel to focus their efforts on plea negotiations without the risk that they would be denied the reasonable time necessary for effective preparation for trial, taking into account the exercise of due diligence.

( ) ______________________________.

**SO ORDERED.**

**Dated: Brooklyn, N.Y**
1/31 20 25

United States Magistrate Judge

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>-v-<br><br>Shane Hennen,<br><br>Defendant(s). | 25-MJ 6 ()<br>ORDER |

Vera Scanlon, United States Magistrate Judge:

This Order is entered, pursuant to Federal Rule of Criminal Procedure 5(f) and the Due Process Protections Act, Pub. L. No 116–182, 134 Stat. 894 (Oct. 21, 2020), to confirm the Government's disclosure obligations under *Brady* v. *Maryland*, 373 U.S. 83 (1963), and its progeny, and to summarize the possible consequences of violating those obligations.

The Government must disclose to the defense all information "favorable to an accused" that is "material either to guilt or to punishment" and that is known to the Government. *Id.* at 87. This obligation applies regardless of whether the defendant requests this information or whether the information would itself constitute admissible evidence. The Government shall disclose such information to the defense promptly after its existence becomes known to the Government so that the defense may make effective use of the information in the preparation of its case.

As part of these obligations, the Government must disclose any information that can be used to impeach the trial testimony of a government witness within the meaning of *Giglio v. United States*, 405 U.S. 150 (1972), and its progeny. Such information must be disclosed sufficiently in advance of trial in order for the defendant to make effective use of it at trial or at such other time as the Court may order.[1]

[1] This Order does not purport to set forth an exhaustive list of the Government's disclosure obligations.

The foregoing obligations are continuing ones and apply to materials that become known to the Government in the future. These obligations also apply to information that is otherwise subject to disclosure regardless of whether the Government credits it.

In the event the Government believes that a disclosure under this Order would compromise witness safety, victim rights, national security, a sensitive law-enforcement technique, or any other substantial government interest, it may apply to the Court for a modification of its obligations, which may include in camera review or withholding or subjecting to a protective order all or part of the information otherwise subject to disclosure.[2]

For purposes of this Order, the Government has an affirmative obligation to seek all information subject to disclosure under this Order from all current or former federal, state, and local prosecutors, law enforcement officers, and other officers who have participated in the prosecution, or investigation that led to the prosecution, of the offense or offenses with which the defendant is charged.

If the Government fails to comply with this Order, the Court, in addition to ordering production of the information, may:

(1) specify the terms and conditions of such production;

(2) grant a continuance;

(3) impose evidentiary sanctions;

(4) impose contempt or other sanctions on any lawyer responsible for violations of the Government's disclosure obligations, or refer the matter to disciplinary authorities;

(5) dismiss charges before trial or vacate a conviction after trial or a guilty plea; or

(6) enter any other order that is just under the circumstances.

---

[2] The Classified Information Procedures Act sets forth separate procedures to be followed in the event that the Government believes matters relating to classified information may arise in connection with the prosecution. *See* 18 U.S.C. app. 3 §§ 1 *et seq*.

SO ORDERED.

Dated: [1/31/2025]
BROOKLYN, NY

__S/ Vera Scanlon__
United States Magistrate Judge

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X

UNITED STATES OF AMERICA
Plaintiff(s),

v.

SHANE HENNEN
Defendant(s)
-------------------------------------------------------X

25-MJ-00006

NOTICE OF MOTION
TO ADMIT COUNSEL
PRO HAC VICE

TO: Opposing Counsel

David I Berman

PLEASE TAKE NOTICE that upon the annexed affidavit of movant in support of this motion and the Certificate(s) of Good Standing annexed thereto, I Todd M Leventhal will move this Court pursuant to Rule 1.3(c) of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York for an order allowing the admission of movant, a member of the firm of Leventhal and Associates, PLLC and a member in good standing of the bar(s) of the State(s) of Nevada and California, as attorney *pro hac vice* to argue or try this case in whole or in part as counsel for Shane Hennen. There are no pending disciplinary proceedings against me in any state or federal court. (If there are any disciplinary proceedings, describe them.)

Dated: 1·22·25·

Respectfully submitted,

[signature]

Signature of Movant
Firm Name Todd M Leventhal
Address 319 S. 3rd Street
Las Vegas, NV 89101
Email leventhalandassociates@gmail.com
Phone 702-472-8686

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA
Plaintiff(s),

v.

SHANE HENNEN
**Defendant(s).**

25-MJ-00006

**AFFIDAVIT IN SUPPORT OF MOTION TO ADMIT COUNSEL *PRO HAC VICE***

I, Todd M Leventhal, being duly sworn, hereby depose and say as follows:

1. I am a(n) Associate with the law firm of Leventhal and Associates, PLLC.
2. I submit this affidavit in support of my motion for admission to practice *pro hac vice* in the above-captioned matter.
3. As shown in the Certificate)s) of Good Standing annexed hereto, I am a member in good standing of the bar of the state(s) of Nevada and California.
4. There are no pending disciplinary proceedings against me in any state or federal court True
5. I Have not been convicted of a felony. If you have, please describe facts and circumstances.
6. I Have not been censured, suspended, disbarred or denied admission or readmission by any court. If you have, please describe facts and circumstances.
7. Attorney Registration Number(s) if applicable: ______________
8. Wherefore, your affiant respectfully submits that s/he be permitted to appear as counsel and advocate *pro hac vice* in case 25-mj-0006for Shane SHANE HENNEN.

Date 1-22-26
______________,

Signature of Movant
Firm Name Leventhal and Associates, PLLC
Address 319 S. 3rd Street
Las Vegas, NV 89101

Email leventhalandassociates@gmail.com
Phone 702-472-8686

**NOTARIZED**
SEE Attached PAGE

## JURAT WITH AFFIANT STATEMENT

State of Nevada
County of Clark } ss.

☒ See Attached Document (Notary to cross out lines 1–7 below)
☐ See Statement Below (Lines 1–7 to be completed only by document signer[s], *not* Notary)

1 ______
2 ______
3 ______
4 ______
5 ______
6 ______
7 ______

*Signature of Document Signer (Affiant) No. 1*

*Signature of Document Signer (Affiant) No. 2 (if any)*

Subscribed and sworn to (or affirmed) before me

this 22 day of January, , by
*Date* *Month* *Year*

(1) Todd M. Leventhal
*Name of Signer No. 1*

(2) ______
*Name of Signer No. 2 (if any)*

MARIBEL GODINEZ
Notary Public, State of Nevada
Appointment No. 09-10522-1
My Appt. Expires Jul 10, 2025

*Place Notary Seal/Stamp Above*

[signature]
*Signature of Notary Public*

*Any Other Required Information (Residence, Expiration Date, etc.)*

*INFORMATION IN AREAS 3-6 REQUIRED IN ARIZONA. OPTIONAL IN OTHER STATES.*

**Description of Any Attached Document**

3 Title or Type of Document: AFFIDAVIT In Support of Motion to Admit Counsel Pro HAC VICE

4 Document Date: 1/22/25 5 Number of Pages: 5

6 Signer(s) Other Than Named Above: ______

# STATE BAR OF NEVADA

## CERTIFICATE OF STANDING

| | |
|---|---|
| **Issue Date:** | 1/21/2025 |
| **Attorney Name:** | Todd M. Leventhal |
| **Neveda Bar Number:** | 8543 |
| **License Type:** | ATTORNEY |
| **License Status:** | Active |
| **Admit/Certification Date:** | 9/25/2003 |

3100 W. Charleston Blvd.
Suite 100
Las Vegas, NV 89102
phone 702.382.2200
toll free 800.254.2797
fax 702.382.2075

9456 Double R Blvd., Ste. B
Reno, NV 89521-5977
phone 775.329.4100
fax 775.329.0522

www.nvbar.org

To Whom It May Concern:

The State Bar of Nevada records indicate that the attorney named above was admitted or certified to practice in the State of Nevada and is in good standing as of the issue date.

If the attorney's License Type is NMATTORNEY (non-member attorney), they were certified to practice pursuant to Nevada Supreme Court Rule 49.1 'Limited practice certification for certain attorneys'. Refer to License Status for the subsection.

This certification expires 30 days from the issue date unless sooner revoked or rendered invalid by operation of rule or law.

Questions may be directed to memberservices@nvbar.org.

Mary Jorgensen

Mary Jorgensen
Member Services Director

No.2025 -10608833
verify by email at memberservices@nvbar.org

# THE STATE BAR OF CALIFORNIA
# CERTIFICATE OF STANDING

January 22, 2025

TO WHOM IT MAY CONCERN:

This is to certify that according to the records of the State Bar, TODD MATTHEW LEVENTHAL, #223577 was admitted to the practice of law in this state by the Supreme Court of California on December 16, 2002 and has been since that date, and is at date hereof, an ACTIVE licensee of the State Bar of California; and that no recommendation for discipline for professional or other misconduct has ever been made by the Board of Trustees or a Disciplinary Board to the Supreme Court of the State of California.

THE STATE BAR OF CALIFORNIA

*Carolina Almarante-Terrero*

Carolina Almarante-Terrero
Custodian of Records

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
– – – – – – – – – – – – – – – – – – – – – – X

UNITED STATES OF AMERICA,

-against-

SHANE HENNEN

Defendant.
– – – – – – – – – – – – – – – – – – – – – – X

APPLICATION AND ORDER
OF EXCLUDABLE DELAY

25-MJ-00006

The United States of America and the defendant SHANE HENNEN hereby jointly request that the time period from 3/26/2025 to 5/25/2025 be excluded in computing the time within which an information or indictment must be filed. The parties seek the foregoing exclusion of time in order because

☒ they are engaged in plea negotiations, which they believe are likely to result in a disposition of this case without trial, and they require an exclusion of time in order to focus efforts on plea negotiations without the risk that they would not, despite their diligence, have reasonable time for effective preparation for trial,

☐ they need additional time to investigate and prepare for trial due to the complexity of the case,

☐ other:

This is the second application for entry of an order of excludable delay. The defendant was arrested on 1/11/2025 and released on 1/13/2025 .

s/ David I. Berman
*Assistant U.S. Attorney*

Todd Leventhal
*Counsel for Defendant*

*For defendant to read, review with counsel, and acknowledge:*

I understand that federal law generally provides that I have a right to have formal charges lodged against me within thirty days of my arrest and a right to a trial on those charges within seventy days after formal charges have been lodged. I further understand that I do not have to consent to the exclusion of time sought in this application and that, by consenting to entry of this order, the date on which formal charges must be lodged will be delayed and the date for the commencement of any trial on those charges will likely be delayed as well. I also understand that if formal charges are not brought against me within the time required by law, I may seek relief from the court, and that this relief might include dismissal of the complaint now pending against me.

I have reviewed this application, as well as the order annexed below, and have discussed the question of whether I should consent to entry of an order of excludable delay carefully with my attorney. I consent to the entry of the order voluntarily and of my own free will. I have not been threatened or coerced for my consent.

**03/26/2025** Shane Hennen

*Date*

SHANE HENNEN
*Defendant*

*For Defendant's Counsel to read and acknowledge*:

I certify that I have reviewed this application and the attached order carefully with my client. I further certify that I have discussed with my client a defendant's right to speedy indictment and the question of whether to consent to entry of an order of excludable delay. I am satisfied that my client understands the contents of this application and the attached order, that my client consents to the entry of the order voluntarily and of his or her own free will, and that my client has not been threatened or coerced for consent.

Todd Leventhal

*Counsel for Defendant*

**ORDER OF EXCLUDABLE DELAY**

Upon the joint application of the United States of America and defendant, SHANE HENNEN , and with the express written consent of the defendant, the time period 3/26/2025 to 5/25/2025 is hereby excluded in computing the time within which an information or indictment must be filed, as the Court finds that this exclusion of time serves the ends of justice and outweighs the best interests of the public and the defendant in a speedy trial because

☒ given the reasonable likelihood that ongoing plea negotiations will result in a disposition of this case without trial, the exclusion of time will allow all counsel to focus their efforts on plea negotiations without the risk that they would be denied the reasonable time necessary for effective preparation for trial, taking into account the exercise of due diligence.

☐ additional time is needed to prepare for trial due to the complexity of case.

☐ other: ______________________________

**SO ORDERED.**

**Dated:** Brooklyn, New York
March 26, 2025

[signature]
Hon. Robert M. Levy
United States Magistrate Judge

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA,

-against-

SHANE HENNEN

Defendant.
- - - - - - - - - - - - - - - - - - - - - - X

APPLICATION AND ORDER OF EXCLUDABLE DELAY

25-MJ-00006

The United States of America and the defendant SHANE HENNEN hereby jointly request that the time period from 5/23/2025 to 7/22/2025 be excluded in computing the time within which an information or indictment must be filed. The parties seek the foregoing exclusion of time in order because

☒ they are engaged in plea negotiations, which they believe are likely to result in a disposition of this case without trial, and they require an exclusion of time in order to focus efforts on plea negotiations without the risk that they would not, despite their diligence, have reasonable time for effective preparation for trial,

☐ they need additional time to investigate and prepare for trial due to the complexity of the case,

☐ other:

This is the third application for entry of an order of excludable delay. The defendant was arrested on 1/11/2025 and released on 1/13/2025.

*Assistant U.S. Attorney*

*Counsel for Defendant*

*For defendant to read, review with counsel, and acknowledge:*

I understand that federal law generally provides that I have a right to have formal charges lodged against me within thirty days of my arrest and a right to a trial on those charges within seventy days after formal charges have been lodged. I further understand that I do not have to consent to the exclusion of time sought in this application and that, by consenting to entry of this order, the date on which formal charges must be lodged will be delayed and the date for the commencement of any trial on those charges will likely be delayed as well. I also understand that if formal charges are not brought against me within the time required by law, I may seek relief from the court, and that this relief might include dismissal of the complaint now pending against me.

I have reviewed this application, as well as the order annexed below, and have discussed the question of whether I should consent to entry of an order of excludable delay carefully with my attorney. I consent to the entry of the order voluntarily and of my own free will. I have not been threatened or coerced for my consent.

5/23/25
*Date*

SHANE HENNEN
*Defendant*

*For Defendant's Counsel to read and acknowledge*:

I certify that I have reviewed this application and the attached order carefully with my client. I further certify that I have discussed with my ~~client a defendant~~'s right to speedy indictment and the question of whether to consent to entry of an order of excludable delay. I am satisfied that my client understands the contents of this application and the attached order, that my client consents to the entry of the order voluntarily and of his or her own free will, and that my client has not been threatened or coerced for consent.

*Counsel for Defendant*

**ORDER OF EXCLUDABLE DELAY**

Upon the joint application of the United States of America and defendant, SHANE HENNEN, and with the express written consent of the defendant, the time period 5/23/2025 to 7/22/2025 is hereby excluded in computing the time within which an information or indictment must be filed, as the Court finds that this exclusion of time serves the ends of justice and outweighs the best interests of the public and the defendant in a speedy trial because

☒ given the reasonable likelihood that ongoing plea negotiations will result in a disposition of this case without trial, the exclusion of time will allow all counsel to focus their efforts on plea negotiations without the risk that they would be denied the reasonable time necessary for effective preparation for trial, taking into account the exercise of due diligence.

☐ additional time is needed to prepare for trial due to the complexity of case.

☐ other: ____________________

**SO ORDERED.**

**Dated:** Brooklyn, New York
May 23, 2025

James R. Cho
Select Duty Magistrate Judge
United States Magistrate Judge

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA,

-against-

SHANE HENNEN

Defendant.
- - - - - - - - - - - - - - - - - - - - X

APPLICATION AND ORDER OF EXCLUDABLE DELAY

25-MJ-00006

The United States of America and the defendant SHANE HENNEN hereby jointly request that the time period from 7/22/2025 to 9/20/2025 be excluded in computing the time within which an information or indictment must be filed. The parties seek the foregoing exclusion of time in order because

☒ they are engaged in plea negotiations, which they believe are likely to result in a disposition of this case without trial, and they require an exclusion of time in order to focus efforts on plea negotiations without the risk that they would not, despite their diligence, have reasonable time for effective preparation for trial,

☐ they need additional time to investigate and prepare for trial due to the complexity of the case,

☐ other:

This is the fourth application for entry of an order of excludable delay. The defendant was arrested on 1/11/2025 and released on 1/13/2025 .

David A. Berman
*Assistant U.S. Attorney*

*Counsel for Defendant*

*For defendant to read, review with counsel, and acknowledge:*

I understand that federal law generally provides that I have a right to have formal charges lodged against me within thirty days of my arrest and a right to a trial on those charges within seventy days after formal charges have been lodged. I further understand that I do not have to consent to the exclusion of time sought in this application and that, by consenting to entry of this order, the date on which formal charges must be lodged will be delayed and the date for the commencement of any trial on those charges will likely be delayed as well. I also understand that if formal charges are not brought against me within the time required by law, I may seek relief from the court, and that this relief might include dismissal of the complaint now pending against me.

I have reviewed this application, as well as the order annexed below, and have discussed the question of whether I should consent to entry of an order of excludable delay carefully with my attorney. I consent to the entry of the order voluntarily and of my own free will. I have not been threatened or coerced for my consent.

7-21-2025
*Date*

SHANE HENNEN
*Defendant*

*For Defendant's Counsel to read and acknowledge*:

I certify that I have reviewed this application and the attached order carefully with my client. I further certify that I have discussed with my client a defendant's right to speedy indictment and the question of whether to consent to entry of an order of excludable delay. I am satisfied that my client understands the contents of this application and the attached order, that my client consents to the entry of the order voluntarily and of his or her own free will, and that my client has not been threatened or coerced for consent.

*Counsel for Defendant*

**ORDER OF EXCLUDABLE DELAY**

Upon the joint application of the United States of America and defendant, SHANE HENNEN , and with the express written consent of the defendant, the time period 7/22/2025 to 9/20/2025 is hereby excluded in computing the time within which an information or indictment must be filed, as the Court finds that this exclusion of time serves the ends of justice and outweighs the best interests of the public and the defendant in a speedy trial because

☒ given the reasonable likelihood that ongoing plea negotiations will result in a disposition of this case without trial, the exclusion of time will allow all counsel to focus their efforts on plea negotiations without the risk that they would be denied the reasonable time necessary for effective preparation for trial, taking into account the exercise of due diligence.

☐ additional time is needed to prepare for trial due to the complexity of case.

☐ other: ______________________________

**SO ORDERED.**

**Dated:** Brooklyn, New York
July 22, **20**25

[redacted]
Hon. Peggy Kuo
United States Magistrate Judge

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
– – – – – – – – – – – – – – – – – – – – – – X

UNITED STATES OF AMERICA,

-against-

SHANE HENNEN

Defendant.
– – – – – – – – – – – – – – – – – – – – – – X

APPLICATION AND ORDER
OF EXCLUDABLE DELAY

25-MJ-00006

The United States of America and the defendant SHANE HENNEN hereby jointly request that the time period from 9/22/2025 to 11/21/2025 be excluded in computing the time within which an information or indictment must be filed. The parties seek the foregoing exclusion of time in order because

☒ they are engaged in plea negotiations, which they believe are likely to result in a disposition of this case without trial, and they require an exclusion of time in order to focus efforts on plea negotiations without the risk that they would not, despite their diligence, have reasonable time for effective preparation for trial,

☐ they need additional time to investigate and prepare for trial due to the complexity of the case,

☐ other:

This is the fifth application for entry of an order of excludable delay. The defendant was arrested on 1/11/2025 and released on 1/13/2025.

David A. Berman
*Assistant U.S. Attorney*

Todd Leventhal
*Counsel for Defendant*

*For defendant to read, review with counsel, and acknowledge:*

I understand that federal law generally provides that I have a right to have formal charges lodged against me within thirty days of my arrest and a right to a trial on those charges within seventy days after formal charges have been lodged. I further understand that I do not have to consent to the exclusion of time sought in this application and that, by consenting to entry of this order, the date on which formal charges must be lodged will be delayed and the date for the commencement of any trial on those charges will likely be delayed as well. I also understand that if formal charges are not brought against me within the time required by law, I may seek relief from the court, and that this relief might include dismissal of the complaint now pending against me.

I have reviewed this application, as well as the order annexed below, and have discussed the question of whether I should consent to entry of an order of excludable delay carefully with my attorney. I consent to the entry of the order voluntarily and of my own free will. I have not been threatened or coerced for my consent.

09/22/2025 — Shane Hennen

*Date* — SHANE HENNEN, *Defendant*

*For Defendant's Counsel to read and acknowledge*:

I certify that I have reviewed this application and the attached order carefully with my client. I further certify that I have discussed with my client a defendant's right to speedy indictment and the question of whether to consent to entry of an order of excludable delay. I am satisfied that my client understands the contents of this application and the attached order, that my client consents to the entry of the order voluntarily and of his or her own free will, and that my client has not been threatened or coerced for consent.

Todd Leventhal

*Counsel for Defendant*

**ORDER OF EXCLUDABLE DELAY**

Upon the joint application of the United States of America and defendant, SHANE HENNEN, and with the express written consent of the defendant, the time period 9/22/2025 to 11/21/2025 is hereby excluded in computing the time within which an information or indictment must be filed, as the Court finds that this exclusion of time serves the ends of justice and outweighs the best interests of the public and the defendant in a speedy trial because

☒ given the reasonable likelihood that ongoing plea negotiations will result in a disposition of this case without trial, the exclusion of time will allow all counsel to focus their efforts on plea negotiations without the risk that they would be denied the reasonable time necessary for effective preparation for trial, taking into account the exercise of due diligence.

☐ additional time is needed to prepare for trial due to the complexity of case.

☐ other: ____________________

**SO ORDERED.**

**Dated:** Brooklyn, New York
**September 22, 2025**

[redacted]

United States Magistrate Judge

FILED
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.
* OCTOBER 16, 2025 *
BROOKLYN OFFICE

JPL:KTF/BLW/DIB
F. #2024R00288

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

- against -

ERIC EARNEST,
also known as "Spook,"
MARVES FAIRLEY,
also known as "Vez," "Vezino"
and "Vezino Locks,"
SHANE HENNEN,
also known as "Sugar,"
DAMON JONES,
also known as "D Jones" and
"Dee Jones,"
DENIRO LASTER,
also known as "Niro," "Payso"
and "Peso," and
TERRY ROZIER,
also known as "Scary Terry" and
"Chum,"

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - X

I N D I C T M E N T

Cr. No. 25-CR-323
(T. 18, U.S.C., §§ 981(a)(1)(C), 982(a)(1), 982(b)(1), 1349, 1956(h) and 3551 et seq.; T. 21, U.S.C., § 853(p); T. 28, U.S.C., § 2461(c))

Judge Rachel P. Kovner
Magistrate Judge Joseph A. Marutollo

THE GRAND JURY CHARGES:

## INTRODUCTION

At all times relevant to this Indictment, unless otherwise indicated:

I. The Defendants and Relevant Entities and Individuals

A. The Defendants

1. The defendant ERIC EARNEST, also known as "Spook," was a resident of Missouri.

2. The defendant MARVES FAIRLEY, also known as "Vez," "Vezino" and "Vezino Locks," was a resident of Mississippi. FAIRLEY represented himself on Instagram as a successful sports bettor and sold sports betting picks through his Instagram profiles.

3. The defendant SHANE HENNEN, also known as "Sugar," was a resident of Pennsylvania and Nevada. HENNEN represented himself on Instagram as a successful sports bettor and sold sports betting picks through his Instagram profiles.

4. The defendant DAMON JONES, also known as "D Jones" and "Dee Jones," was a resident of Texas. JONES was a National Basketball Association ("NBA") player from approximately 1999 through 2009 and an NBA coach from approximately 2016 through 2018.

5. The defendant DENIRO LASTER, also known as "Peso," "Payso" and "Niro," was a resident of Ohio.

6. The defendant TERRY ROZIER, also known as "Scary Terry" and "Chum," was a resident of Ohio, North Carolina and Florida. ROZIER was a professional basketball player who has played in the NBA since 2015. During the 2022-2023 NBA season, ROZIER played for the Charlotte Hornets. ROZIER was close friends with the defendant DENIRO LASTER, and they had known each other since childhood.

B. The NBA and the Betting Companies

7. The NBA was a professional basketball league in North America. Among others, NBA teams included the Charlotte Hornets, Chicago Bulls, Cleveland Cavaliers, Los Angeles Clippers, Los Angeles Lakers, Milwaukee Bucks, New Orleans Pelicans, Oklahoma City Thunder, Orlando Magic, Philadelphia 76ers, Portland Trail Blazers, Sacramento Kings and Toronto Raptors. The NBA maintained codes of conduct applicable to its players, coaches and

management that prohibited, among other things, wagering in connection with NBA games or providing non-public information relating to NBA games to others. Such codes of conduct also required NBA players, coaches and management to provide their best services and loyalty to their teams.

8. NBA teams were required to report to the NBA information concerning player injuries, illnesses and rest for all NBA games. On each gameday, the NBA disseminated an "injury report" for each NBA team playing that day. The injury reports identified players as falling within one of the following categories: "available," "probable," "questionable," "doubtful" and "out." The injury reports were updated multiple times throughout each gameday.

9. Betting Companies 1 through 4, entities the identities of which are known to the Grand Jury, were licensed gambling companies operating in the United States that offered sports betting services (collectively, and together with other online sportsbooks and retail sportsbooks, the "Betting Companies"). The Betting Companies offered sports betting services relating to, among other things, NBA games and individual players' statistical performances in NBA games. Since approximately 2021, Betting Company 1 and Betting Company 2 have been the co-official sports betting partners of the NBA.

C. Other Relevant Individuals

10. Long Phi Pham, also known as "Bruce," was a resident of Queens, New York.

11. Timothy McCormack was a resident of New York, New York.

12. Jontay Porter was a resident of Missouri. Porter was an NBA player during the 2023-2024 NBA season.

13. Co-Conspirator 1, an individual whose identity is known to the Grand Jury, was a resident of Florida. Co-Conspirator 1 was at times an NBA player.

14. Co-Conspirator 2, an individual whose identity is known to the Grand Jury, was a resident of Pennsylvania.

15. Co-Conspirator 3, an individual whose identity is known to the Grand Jury, was a resident of Louisiana.

16. Co-Conspirator 4, an individual whose identity is known to the Grand Jury, was a resident of Michigan.

17. Co-Conspirator 5, an individual whose identity is known to the Grand Jury, was a resident of Pennsylvania. Co-Conspirator 5 was a relative of the defendant SHANE HENNEN.

18. Co-Conspirator 6, an individual whose identity is known to the Grand Jury, was a resident of Ohio. Co-Conspirator 6 was a relative of the defendant TERRY ROZIER.

19. Co-Conspirator 7, an individual whose identity is known to the Grand Jury, was a resident of North Carolina. Co-Conspirator 7 was a relative of the defendant DENIRO LASTER.

20. Co-Conspirator 8, an individual whose identity is known to the Grand Jury, was a resident Oregon. Co-Conspirator 8 was an NBA player from approximately 1997 through 2014, and an NBA coach since at least 2021.

21. Co-Conspirator 9, an individual whose identity is known to the Grand Jury, was a resident of Brooklyn, New York.

II. Background on Sports Betting

22. In or about 1992, following several high-profile sports-betting scandals, the United States Congress passed the federal Professional and Amateur Sports Protection Act ("PASPA"), 28 U.S.C. § 3702, which banned all but four states from sponsoring, authorizing, operating or regulating sports wagering. The four excepted states—Nevada, Oregon, Delaware and Montana—had existing sports wagering regimes that PASPA grandfathered in.

23. In or about 2018, following years of litigation between the State of New Jersey—which desired to legalize sports betting—and several major American professional and college sports leagues, the United States Supreme Court struck down PASPA as unconstitutional. In the ensuing years, sports betting, and particularly online sports betting, became legal in dozens of states.

24. The Betting Companies operated online mobile applications, branded retail sportsbooks at various casinos nationwide, or both. Online wagers made through the Betting Companies' online mobile applications were made pursuant to the Betting Companies' respective terms of use. Wagers made at retail sportsbooks were made pursuant to the sportsbooks' house rules. Among other things, the terms of use and house rules generally prohibited users from wagering in connection with sporting contests when the wagers were based on or the users had access to pre-release, confidential information or other non-public information. The terms of use and house rules also prohibited individuals from using others to place wagers on their behalf, otherwise known as straw betting.

25. Despite the recent widespread legalization of sports betting, unlicensed bookmakers or "bookies" also offered sports betting services to bettors. Bookies frequently accepted bets on bespoke betting websites that allowed users to place various types of wagers on

sporting contests based on publicly available betting lines. Unlike legal sportsbooks, bookies typically "settled up" the bettors' wagers (i.e., received payment from and/or paid the bettors in connection with the wagers) offline, generally through cash, peer-to-peer payments or cryptocurrency transactions.

26. A "proposition" or "prop" bet was a bet made regarding the occurrence or non-occurrence during a game of an event not directly affecting the game's outcome. For example, a bettor might wager that a particular player would score more (referred to as betting the "over") or fewer (referred to as betting the "under") points than a certain number of points designated by the betting operator for a given game. Prop bets took many forms. For example, a bettor could place prop bets on the points, rebounds, assists, minutes played and/or three-pointers made by individual NBA players.

27. A "money line" bet was a bet placed on a game's outcome (i.e., which team would win or lose the game). Relatedly, a "point spread" or "spread" bet was a bet placed on the margin of victory or defeat in a given game.

28. A "parlay" bet was a bet that was comprised of two or more individual bets (as opposed to a "single" or "straight" bet, which was comprised of one individual bet). For a bettor to win a parlay bet, each bet, or "leg," within the parlay bet had to be successful.

29. A "betting line" or "line" was a number set by oddsmakers to represent the expected outcome of a particular event. In the context of prop bets, a betting line was the number set by oddsmakers for a given outcome. For example, an oddsmaker might set the betting line for a given player's points in a given game at 20. Bettors would then have the choice to bet the "under" (i.e., that the player will score fewer than 20 points in the game), or the "over" (i.e., that the player will score more than 20 points). Oddsmakers had proprietary

processes for setting betting lines, but betting lines generally took into account all publicly known information relevant to a given bet.

III. The Fraudulent Wagering Scheme

30. In or about and between December 2022 and March 2024, the defendants ERIC EARNEST, MARVES FAIRLEY, SHANE HENNEN, DAMON JONES, DENIRO LASTER and TERRY ROZIER, together with others, participated in a scheme to defraud the Betting Companies by providing, obtaining and using non-public information relating to NBA games to place and cause others to place fraudulent sports wagers for profit, and to launder the proceeds thereof.

31. The fraudulent wagering scheme typically involved various iterations of the same pattern within a network of co-conspirators. The defendants and certain co-conspirators had access to private information known by NBA players or NBA coaches that was likely to affect the outcome of upcoming NBA games or individual players' performances. They provided other co-conspirators this non-public information—in exchange for either a flat fee or a share in expected wagering profits—for the purpose of betting. The co-conspirators disseminated the non-public betting information through a network of individuals who placed bets on the co-conspirators' behalf, placed wagers on their own behalf, or directed others to place wagers, all with the intention of profiting off the scheme at the expense of the Betting Companies. As a result, many of the wagers were placed in connection with betting lines that did not reflect or account for the private information known by the defendants and their co-conspirators, rendering the wagers more profitable.

32. The defendants and their co-conspirators placed and caused others to place these fraudulent wagers through the Betting Companies' mobile applications and retail

sportsbooks. In doing so, the defendants and their co-conspirators made and caused others to make materially false and misleading statements and representations to the Betting Companies, and to omit to state one or more material facts which made what was represented under the circumstances misleading, including that the wagers were placed in accordance with the Betting Companies' terms and conditions and house rules prohibiting, among other things, wagering based on non-public information and straw betting.

33. In many instances, the defendants and their co-conspirators' fraudulent bets were successful and were paid out by the Betting Companies. The Betting Companies would not have paid bettors for successful wagers had they known that the bettors possessed non-public information pertaining to the event or were placing the wagers at the direction of and for the benefit of others.

34. In furtherance of the scheme and to conceal the proceeds derived from it, the defendants and their co-conspirators engaged in and caused others to engage in transactions between and among themselves and others acting on their behalf including peer-to-peer payment platform transfers, bank wires and cash exchanges.

35. Examples of some of the fraudulent wagers and the laundering of proceeds thereof are set forth below.

A. <u>The March 23, 2023 Charlotte Hornets Game</u>

36. During the 2022-2023 NBA season, the defendant TERRY ROZIER played for the Charlotte Hornets. Prior to the Hornets' March 23, 2023 game against the New Orleans Pelicans (the "March 23 Game"), ROZIER informed the defendant DENIRO LASTER that ROZIER was going to prematurely remove himself from the game in the first quarter due to a supposed injury and not return to play further. ROZIER provided this information to

LASTER for the purpose of enabling LASTER to place wagers based on this information. ROZIER was not on the Hornets' injury report prior to the March 23 Game and Hornets officials were not aware of ROZIER's plan to exit the game prematurely. The public, including the Betting Companies, was also not aware of ROZIER's plan to exit the March 23 Game prematurely.

37. The defendant DENIRO LASTER sold the information about the defendant TERRY ROZIER's plan to leave the March 23 Game early to multiple co-conspirators, including to the defendant MARVES FAIRLEY and Co-Conspirator 1, to enable them to place fraudulent wagers based on the non-public information. In exchange for the information, FAIRLEY and Co-Conspirator 1 agreed to pay LASTER approximately $100,000 from their expected fraudulent gambling winnings. Prior to the March 23 Game, FAIRLEY, LASTER and Co-Conspirator 1 exchanged text messages confirming that ROZIER planned to exit the game prematurely and confirming their plan to place wagers on ROZIER's unders (i.e., that ROZIER would underperform relative to the oddsmakers' betting lines for his individual performance).

38. The defendant MARVES FAIRLEY also provided the information to the defendant SHANE HENNEN so that HENNEN, both himself and through a network of straw bettors, could place bets on the defendant TERRY ROZIER's unders. FAIRLEY provided the information to HENNEN and HENNEN agreed to place and direct his associates to place bets on ROZIER's unders based on an agreement between them that HENNEN would give FAIRLEY a share of the profits from his and his associates' winning bets.

39. On or about March 23, 2023 and prior to the start of the March 23 Game, the defendant SHANE HENNEN placed multiple bets at a retail sportsbook operated by Betting

Company 3 totaling approximately $61,200, all of which were either straight or parlay bets on the defendant TERRY ROZIER's unders. In addition to placing bets on ROZIER's unders himself, HENNEN marshalled a network of associates to place bets on ROZIER's unders at HENNEN's direction, including, but not limited to, the following bets, all of which were placed on or about March 23, 2023, prior to the start of the March 23 Game:

(a) Co-Conspirator 2 placed multiple straight or parlay bets on ROZIER's unders at a retail sportsbook operated by Betting Company 1 and on Betting Company 1's mobile application totaling approximately $107,000.

(b) Timothy McCormack and Long Phi Pham placed multiple straight or parlay bets on ROZIER's unders at a retail sportsbook located in New Jersey and operated by Betting Company 1 and on Betting Company 1's mobile application totaling approximately $41,000. Hours earlier, McCormack received two payments totaling approximately $40,000 via a peer-to-peer mobile payment platform that McCormack and Pham used to fund the above-described wagers on ROZIER's unders. While located within the Eastern District of New York, Pham, among other things, engaged in communications regarding and in furtherance of the fraudulent wagering scheme.

(c) Co-Conspirator 3 placed multiple straight or parlay bets on ROZIER's unders at a retail sportsbook operated by Betting Company 1 and on Betting Company 1's mobile application totaling approximately $20,000.

(d) Co-Conspirator 4 placed multiple straight bets on ROZIER's unders at a retail sportsbook operated by Betting Company 1 and on Betting Company 1's mobile application totaling approximately $17,000.

(e) Co-Conspirator 5 placed multiple straight bets on ROZIER's unders at a retail sportsbook operated by Betting Company 4 totaling approximately $12,500.

40. In addition to the defendants and their co-conspirators, others in the defendant TERRY ROZIER's close circle placed wagers on ROZIER's unders in connection with the March 23 Game. For example:

(a) Co-Conspirator 6 placed an approximately $800 bet using Betting Company 1's mobile application on ROZIER's under points. Since approximately 2022, Co-Conspirator 6 has placed dozens of bets on ROZIER's performances in various NBA games via Betting Company 1. Every one of those bets—with the exception of the under bet on ROZIER's points in connection with the March 23 Game—was an over bet. Co-Conspirator 6's bet on ROZIER's unders was successful and Co-Conspirator 6 was paid approximately $1,500 by Betting Company 1. In the days following the March 23 Game, Co-Conspirator 6 placed multiple additional bets using Betting Company 1's mobile application and lost approximately $4,000. Following that string of losses, Co-Conspirator 6 texted the defendant DENIRO LASTER, "I lost that shit on [Betting Company 1] ima give you a lite sack when I see u" and LASTER responded, "Bet."

(b) On or about the morning of March 23, 2023, a relative of LASTER created an online account with Betting Company 1 and shortly thereafter placed an approximately $4,000 parlay wager on ROZIER's unders for the March 23 Game. This wager was funded by Co-Conspirator 7—who on prior occasions in the context of discussing sports betting, had asked for and received from LASTER non-public information relating to ROZIER's health status.

41. During the March 23 Game, the defendant TERRY ROZIER removed himself from the game in the first quarter and did not return. ROZIER played approximately nine minutes and 34 seconds, well below his season average of approximately 35.3 minutes per game. ROZIER scored five points, recorded two assists and made one three-point shot, which were all well below his per-game averages of approximately 21.1 points, 5.1 assists and 2.6 three-pointers and below the lines set by oddsmakers for ROZIER's points, assists and three-pointers in the March 23 Game. ROZIER collected four rebounds, which was in line with his per-game average of approximately 4.1 rebounds and above the line set by oddsmakers for ROZIER's rebounds in the March 23 Game. ROZIER's early exit from the March 23 Game and his related underperformance relative to his season averages for points, assists and three-pointers resulted in the success of numerous fraudulent wagers placed on ROZIER's unders by the defendants and their co-conspirators.

42. On or about March 28, 2023, the defendant MARVES FAIRLEY traveled to Philadelphia, Pennsylvania to collect proceeds from the defendant SHANE HENNEN from the successful wagers HENNEN and his associates placed on the March 23 Game, as well as proceeds from other fraudulent wagers FAIRLEY and HENNEN made in connection with the fraudulent wagering scheme. On or about March 28, 2023, the defendant DENIRO LASTER also traveled to Philadelphia to collect from FAIRLEY proceeds from the fraudulent wagering scheme relating to the defendant TERRY ROZIER's performance in the March 23 Game. ROZIER arranged and paid for LASTER's travel to Philadelphia. In or about and between the late-night hours of March 28, 2023 and the early morning hours of March 29, 2023, FAIRLEY gave LASTER tens of thousands of dollars in cash as payment for the non-public information

that LASTER had obtained from ROZIER and had provided to FAIRLEY regarding ROZIER's plan to exit prematurely from the March 23 Game.

43. After the defendant DENIRO LASTER collected his cut of the fraudulent wagering scheme proceeds from the defendant MARVES FAIRLEY, LASTER drove from Philadelphia to the defendant TERRY ROZIER's home in Charlotte, North Carolina. LASTER arrived in Charlotte on or about March 30, 2023 and met ROZIER at his home that day. During the early morning hours of April 1, 2023, LASTER and ROZIER counted the money that LASTER had obtained from FAIRLEY in Philadelphia.

B. The March 24, 2023 Portland Trail Blazers Game

44. On or about March 24, 2023, the Portland Trail Blazers played the Chicago Bulls (the "March 24 Game"). Prior to the game, the Trail Blazers' record was 32-40 and the team was out of playoff contention with only 10 games remaining in the season. Prior to the March 24 Game, Co-Conspirator 8 told the defendant ERIC EARNEST that the Trail Blazers were going to be tanking (i.e., intentionally losing) to increase their odds of getting a better draft pick in the upcoming NBA draft. Co-Conspirator 8 told EARNEST, before the news was publicly announced, that several of the Trail Blazers' best players, including Player 1, an individual whose identity is known to the Grand Jury, would not be playing in the March 24 Game. The information that the Trail Blazers would be tanking and not playing Player 1 was not available to the public, including the Betting Companies.

45. Prior to the March 24 Game, the defendant ERIC EARNEST provided this non-public inside information to the defendant MARVES FAIRLEY so that FAIRLEY could place fraudulent wagers on the game and share the profits with EARNEST. In exchange, FAIRLEY ultimately promised to pay EARNEST at least $5,000 if the bets against the Trail

Blazers were successful. In addition, FAIRLEY texted EARNEST a screenshot of a purported $20,000 wire transfer from FAIRLEY's bank account to EARNEST, accompanied by the message "Address for wire."

46. After the defendant MARVES FAIRLEY learned from the defendant ERIC EARNEST that the Trail Blazers planned not to play their best players in the March 24 Game, FAIRLEY conveyed that non-public information to Co-Conspirator 1. FAIRLEY and Co-Conspirator 1 agreed to split the profits on successful wagers they could place against the Trail Blazers.

47. Before these key Trail Blazers players were publicly ruled out of the March 24 Game, the defendants MARVES FAIRLEY and SHANE HENNEN, themselves and together with their co-conspirators including Co-Conspirator 1, placed and caused the placement of multiple bets that the Trail Blazers would lose the March 24 Game totaling more than approximately $100,000. For example, between approximately 12:00 p.m. EST and 7:00 p.m. EST on March 24, 2023, which was before the key Trail Blazers players were publicly ruled out, Timothy McCormack and Long Phi Pham, acting together and with Pham acting at HENNEN's direction, placed bets against the Trail Blazers of approximately $20,000 through Betting Company 1's mobile application and approximately $12,000 through Betting Company 2's mobile application.

48. The NBA injury reports publicly released at approximately 1:30 p.m. EST and 2:30 p.m. EST on March 24, 2023 reported that Player 1 was, respectively, "probable" and then "questionable" to play in the March 24 Game. At approximately 9:30 p.m. EST on March 24, 2023—approximately half an hour before the start of the March 24 Game—the NBA released an injury report listing Player 1 and others as "out" for the game. The "out" group

included the Trail Blazers' four highest per-game scorers during the 2022-2023 season. The betting lines relating to the March 24 Game changed upon the public release of the Trail Blazers' key players' injury statuses.

49. The fraudulent wagers against the Trail Blazers placed and caused by the defendants MARVES FAIRLEY and SHANE HENNEN, together with co-conspirators acting at their direction were successful, as the Bulls beat the Trail Blazers 124-96.

C. The April 6, 2023 Orlando Magic Game

50. On or about April 6, 2023, the Orlando Magic played the Cleveland Cavaliers (the "April 6 Game"). The defendant MARVES FAIRLEY and Co-Conspirator 1 leveraged Co-Conspirator 1's personal relationship with one of the Magic's regularly starting players, Player 2, an individual whose identity is known to the Grand Jury, to obtain non-public information about the April 6 Game which they used to place at least one successful wager.

51. Hours before the April 6 Game, Player 2 told Co-Conspirator 1, before the news was publicly announced, that the Magic would not be playing its entire regular starting lineup (i.e., the team's best players) in the April 6 Game. After receiving this information, Co-Conspirator 1 provided this information to the defendant MARVES FAIRLEY. At the time that Co-Conspirator 1 shared this information with FAIRLEY, the Magic were favored to win the game by approximately nine points. Shortly thereafter, FAIRLEY placed an approximately $11,000 wager with an unlicensed bookmaker that the Cavaliers would cover the game's spread of 9.5 points, that is, the bet would be successful if the Cavaliers won the game outright or lost the game by nine points or fewer.

52. The Magic did not play its entire regular starting lineup in the April 6 Game and the betting lines changed upon the public release of information relating to the

Magic's starting lineup. The Cavaliers beat the Magic by 24 points in the April 6 Game, thus rendering FAIRLEY and Co-Conspirator 1's fraudulent bet against the Magic successful.

D. The February 9, 2023 and January 15, 2024 Los Angeles Lakers Games

53. The defendant DAMON JONES was a former NBA player and assistant coach. JONES played in the NBA from approximately 1999 through 2008, including as a member of the Cavaliers from approximately 2005 through 2008. JONES was an assistant coach on the Cavaliers from approximately 2014 through 2018. JONES was also an unofficial assistant coach on the Los Angeles Lakers during the 2022-2023 NBA season. During many of those years, JONES was a teammate or coach of a prominent NBA player ("Player 3"), an individual whose identity is known to the Grand Jury.

54. By virtue of his relationship with Player 3, the Lakers and other NBA personnel, the defendant DAMON JONES had access to non-public information, including medical information that had not been released to the public. On multiple occasions during the 2022–2023 and 2023-2024 NBA seasons, including as early as approximately December 2022, JONES sold or attempted to sell for profit non-public information to others, including to the defendants ERIC EARNEST and MARVES FAIRLEY and others, for the purpose of causing or enabling them to place fraudulent wagers based on the non-public information.

55. For example, on or about February 9, 2023, the Lakers played the Milwaukee Bucks (the "February 9 Game"). On the morning of the February 9 Game, the defendant DAMON JONES sent a text message to Co-Conspirator 9, writing: "Get a big bet on Milwaukee tonight before the information is out! [Player 3] is out tonight. Bet enough so Djones can eat to [sic] now!!!" At the time JONES provided this non-public information about Player 3 to Co-Conspirator 9, Player 3 was not ruled out on the NBA's injury report for the

February 9 Game. Due to a lower body injury, Player 3 did not play in the February 9 Game, which the Lakers lost.

56. On multiple other occasions during the 2023-2024 NBA season, including in connection with a January 15, 2024 game between the Lakers and the Oklahoma City Thunder (the "January 15 Game"), the defendants DAMON JONES and ERIC EARNEST sold or attempted to sell to the defendant MARVES FAIRLEY non-public information for the purpose of causing or enabling FAIRLEY to place wagers based on the non-public information. In exchange, FAIRLEY agreed to pay JONES via EARNEST.

57. Player 4, an individual whose identity is known to the Grand Jury, was one of the Lakers' best players during the 2023-2024 NBA season. Prior to the January 15 Game, the defendant DAMON JONES claimed to have learned from the trainer for Players 3 and 4 that Player 4 was injured and was only going to play a limited number of minutes and/or his performance would likely be affected in the game because of the injury. JONES shared this non-public information with the defendant ERIC EARNEST, who then sent a text message to the defendant MARVES FAIRLEY stating, "Hit me asap got one for u dude say he got some info." EARNEST then shared the non-public information about Player 4 with FAIRLEY. FAIRLEY paid JONES approximately $2,500, through an intermediary, via a peer-to-peer mobile payment platform, accompanied by the message: "fee."

58. After receiving this non-public information and before the January 15, 2024 game began, the defendant MARVES FAIRLEY shared the information with Co-Conspirator 1 and the defendant SHANE HENNEN. FAIRLEY and Co-Conspirator 1 then placed and caused the placement of multiple bets against the Lakers. For example, FAIRLEY placed an approximately $100,000 bet against the Lakers at a retail sportsbook operated by

Betting Company 2. Hours before the January 15 Game, the NBA injury report listed Player 4 as "probable," and it was not publicly disseminated, including to the Betting Companies, that Player 4 would possibly play a limited number of minutes and/or poorly due to injury.

59. Ultimately, Player 4 played in the January 15 Game in line with his season average in minutes and performed well, and the Lakers won the game. After the January 15 Game, the defendant MARVES FAIRLEY requested, via the defendant ERIC EARNEST, that the defendant DAMON JONES repay FAIRLEY the $2,500 that FAIRLEY had paid for the non-public information. Despite the Lakers winning the January 15 Game, JONES reaffirmed to EARNEST after the game, including via text message, that he had received credible non-public information regarding Player 4 prior to the game.

E. The January 26, 2024 and March 20, 2024 Toronto Raptors Games

60. On or about January 26, 2024 and March 20, 2024, the Toronto Raptors played the Los Angeles Clippers (the "January 26 Game") and the Sacramento Kings (the "March 20 Game"), respectively.

61. Prior to the January 26 Game and the March 20 Game, Jontay Porter, then a player on the Raptors, agreed with Long Phi Pham and others to exit the game prematurely, on the basis of purported injuries, so that certain of their co-conspirators could place fraudulent wagers on Porter's unders.

62. Prior to both the January 26 Game and the March 20 Game, Pham provided the non-public information about Porter to the defendant SHANE HENNEN for the purpose of causing or enabling HENNEN to place fraudulent wagers based on the non-public information. After obtaining this non-public information, HENNEN shared this information with the defendant MARVES FAIRLEY for the purpose of causing or enabling FAIRLEY to

place additional fraudulent wagers based on the non-public information. After obtaining the non-public information relating to Porter's plan to exit the January 26 Game and the March 20 Game early, HENNEN placed and directed and caused a number of his associates to place wagers on Porter's unders, all of which were successful. HENNEN conducted multiple transfers via peer-to-peer mobile payment platforms to promote the scheme and distribute the proceeds of such wagers.

COUNT ONE
(Conspiracy to Commit Wire Fraud)

63. The allegations contained in paragraphs one through 62 are realleged and incorporated as if fully set forth in this paragraph.

64. In or about and between December 2022 and March 2024, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants ERIC EARNEST, also known as "Spook," MARVES FAIRLEY, also known as "Vez," "Vezino" and "Vezino Locks," SHANE HENNEN, also known as "Sugar," DAMON JONES, also known as "D Jones" and "Dee Jones," DENIRO LASTER, also known as "Niro," "Payso" and "Peso," and TERRY ROZIER, also known as "Scary Terry" and "Chum," together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud the Betting Companies, and to obtain money and property from them by means of one or more materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce writings, signs, signals, pictures and sounds, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

COUNT TWO
(Conspiracy to Commit Money Laundering)

65. The allegations contained in paragraphs one through 62 are realleged and incorporated as if fully set forth in this paragraph.

66. In or about and between December 2022 and March 2024, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants ERIC EARNEST, also known as "Spook," MARVES FAIRLEY, also known as "Vez," "Vezino" and "Vezino Locks," SHANE HENNEN, also known as "Sugar," DAMON JONES, also known as "D Jones" and "Dee Jones," DENIRO LASTER also known as "Niro," "Payso" and "Peso," and TERRY ROZIER, also known as "Scary Terry" and "Chum," together with others, did knowingly and intentionally conspire:

(a) to conduct one or more financial transactions in and affecting interstate commerce, which transactions in fact involved the proceeds of specified unlawful activity, to wit: wire fraud, in violation of Title 18, United States Code, Section 1343, knowing that the property involved in the transactions represented the proceeds of some form of unlawful activity, and with the intent to promote the carrying on of the specified unlawful activity, contrary to Title 18, United States Code, Section 1956(a)(1)(A)(i);

(b) to conduct one or more financial transactions in and affecting interstate commerce, which transactions in fact involved the proceeds of some form of unlawful activity, to wit: wire fraud, in violation of Title 18, United States Code, Section 1343, knowing that the property involved in the transactions represented the proceeds of some form of unlawful activity, and knowing that the transactions were designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership and the control of the proceeds of the

specified unlawful activity, contrary to Title 18, United States Code, Section 1956(a)(1)(B)(i); and

(c) to engage in one or more monetary transactions in and affecting interstate and foreign commerce, in criminally derived property that was of a value greater than $10,000 and that was derived from specified unlawful activity, to wit: wire fraud, in violation of Title 18, United States Code, Section 1343, contrary to Title 18, United States Code, Section 1957(a).

(Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

CRIMINAL FORFEITURE ALLEGATION
AS TO COUNT ONE

67. The United States hereby gives notice to the defendants that, upon their conviction of the offense charged in Count One, the government will seek forfeiture in accordance with Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), which require any person convicted of such offense to forfeit any property, real or personal, constituting, or derived from, proceeds obtained directly or indirectly as a result of such offense.

68. If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

(a) cannot be located upon the exercise of due diligence;

(b) has been transferred or sold to, or deposited with, a third party;

(c) has been placed beyond the jurisdiction of the court;

(d) has been substantially diminished in value; or

(e) has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendants up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Section 981(a)(1)(C); Title 21, United States Code, Section 853(p); Title 28, United States Code, Section 2461(c))

CRIMINAL FORFEITURE ALLEGATION
AS TO COUNT TWO

69. The United States hereby gives notice to the defendants that, upon their conviction of the offense charged in Count Two, the government will seek forfeiture in accordance with Title 18, United States Code, Section 982(a)(1), which requires any person convicted of such offense to forfeit any property, real or personal, involved in such offense, or any property traceable to such property.

70. If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

(a) cannot be located upon the exercise of due diligence;

(b) has been transferred or sold to, or deposited with, a third party;

(c) has been placed beyond the jurisdiction of the court;

(d) has been substantially diminished in value; or

(e) has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1), to seek forfeiture of any other

property of the defendants up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Sections 982(a)(1) and 982(b)(1); Title 21, United States Code, Section 853(p))

A TRUE BILL

s/

FOREPERSON

By David Pitluck, Assistant U.S. Attorney

JOSEPH NOCELLA, JR.
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

DIB
F. #2024R00288

October 23, 2025

By ECF and E-Mail

The HONORABLE JAMES R. CHO
United States Magistrate Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Re: United States v. Eric Earnest, et al.
Criminal Docket No. 25-323 (LDH)

Dear Judge Cho:

The government respectfully moves for an order unsealing the indictment and arrest warrants in the above-captioned matter.

Respectfully submitted,

JOSEPH NOCELLA, JR.
United States Attorney

By: /s/ David I. Berman
David I. Berman
Assistant U.S. Attorney
(718) 254-6167

Enclosure

cc: Clerk of Court (by ECF)
Defense Counsel of Record (by ECF)

DIB
F.# 2024R00288

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

- against -

ERIC EARNEST, ET AL.,

Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - X

PROPOSED ORDER

CR 25-323 (LDH)

Upon the application of JOSEPH NOCELLA, JR., United States Attorney for the Eastern District of New York, by Assistant United States Attorney David I. Berman, for an order unsealing the ~~complaint~~ indictment and arrest warrant in the above-captioned matter.

WHEREFORE, it is ordered that the indictment and arrest warrants in the above-captioned matter be unsealed.

Dated: Brooklyn, New York
10/23, 2025

HONORABLE JAMES R. CHO
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

F. #2024R00288

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

- against - 25-CR-323 (LDH)

ERIC EARNEST, et al.,

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

NOTICE OF APPEARANCE

PLEASE TAKE NOTICE that Assistant United States Attorney Benjamin Weintraub from this point forward will be added as counsel in the above-captioned matter.

All future correspondence to the United States in the above-captioned matter should be sent to:

Assistant U.S. Attorney Benjamin Weintraub
United States Attorney's Office (Criminal Division)
271-A Cadman Plaza East
Brooklyn, New York 11201
Tel: (718) 254-6519
Email: Benjamin.weintraub@usdoj.gov

In addition, the Clerk of the Court is respectfully requested to ensure that all future ECF notifications are sent to Assistant United States Attorney Benjamin Weintraub at the email address set forth above.

Dated: Brooklyn, New York
October 28, 2025

Respectfully submitted,

JOSEPH NOCELLA, JR.
United States Attorney

By: *Benjamin Weintraub*
Benjamin Weintraub
Assistant U.S. Attorney

cc: Clerk of the Court (LDH)

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

-v-

Shane Hennen,

Defendant(s).

25 CR 325 (LDH)

ORDER

Taryn Merkl, United States Magistrate Judge:

This Order is entered, pursuant to Federal Rule of Criminal Procedure 5(f) and the Due Process Protections Act, Pub. L. No 116–182, 134 Stat. 894 (Oct. 21, 2020), to confirm the Government's disclosure obligations under *Brady* v. *Maryland*, 373 U.S. 83 (1963), and its progeny, and to summarize the possible consequences of violating those obligations.

The Government must disclose to the defense all information "favorable to an accused" that is "material either to guilt or to punishment" and that is known to the Government. *Id.* at 87. This obligation applies regardless of whether the defendant requests this information or whether the information would itself constitute admissible evidence. The Government shall disclose such information to the defense promptly after its existence becomes known to the Government so that the defense may make effective use of the information in the preparation of its case.

As part of these obligations, the Government must disclose any information that can be used to impeach the trial testimony of a Government witness within the meaning of *Giglio v. United States*, 405 U.S. 150 (1972), and its progeny. Such information must be disclosed sufficiently in advance of trial in order for the defendant to make effective use of it at trial or at such other time as the Court may order.[1]

[1] This Order does not purport to set forth an exhaustive list of the Government's disclosure obligations.

The foregoing obligations are continuing ones and apply to materials that become known to the Government in the future. These obligations also apply to information that is otherwise subject to disclosure regardless of whether the Government credits it.

In the event the Government believes that a disclosure under this Order would compromise witness safety, victim rights, national security, a sensitive law-enforcement technique, or any other substantial government interest, it may apply to the Court for a modification of its obligations, which may include in camera review or withholding or subjecting to a protective order all or part of the information otherwise subject to disclosure.[2]

For purposes of this Order, the Government has an affirmative obligation to seek all information subject to disclosure under this Order from all current or former federal, state, and local prosecutors, law enforcement officers, and other officers who have participated in the prosecution, or investigation that led to the prosecution, of the offense or offenses with which the defendant is charged.

If the Government fails to comply with this Order, the Court, in addition to ordering production of the information, may:

(1) specify the terms and conditions of such production;

(2) grant a continuance;

(3) impose evidentiary sanctions;

(4) impose contempt or other sanctions on any lawyer responsible for violations of the Government's disclosure obligations, or refer the matter to disciplinary authorities;

(5) dismiss charges before trial or vacate a conviction after trial or a guilty plea; or

(6) enter any other order that is just under the circumstances.

[2] The Classified Information Procedures Act sets forth separate procedures to be followed in the event that the Government believes matters relating to classified information may arise in connection with the prosecution. *See* 18 U.S.C. app. 3 §§ 1 *et seq*.

SO ORDERED.

Dated: October 30, 2025
BROOKLYN, NY

S / Taryn Merkl
United States Magistrate Judge

# MINUTE ENTRY FOR ARRAIGNMENT PROCEEDING

| | | | |
|---|---|---|---|
| **MAGISTRATE JUDGE:** Taryn Merkl | | **DATE:** 10/30/2025 | |
| **CLERK:** D. Wright | | | |
| **DOCKET #**: 25 CR 323(LDH) | | **LOG TIME:** 3:01-3:42pm | |
| **DEFENDANTS NAME:** Shane Hennen | | | |
| __x__ Present | ____ Not Present | ____ Custody | __x__ Bail |
| **DEFENSE COUNSEL**: Todd Leventhal | | | |
| _____ Court Appointed | _____ Federal Defender | ____ CJA | __x__ Retained |
| **A.U.S.A:** Benjamin Weintraub | | | |
| **INTERPRETER:** | | **LANGUAGE:** | |
| Defendant arraigned on the: ___ Complaint __x__ Indictment ___ Superseding Indictment ___ Probation Violation | | | |
| __x__ Defendant pleads NOT GUILTY to ALL counts. | | ____ Defendants first appearance. | |
| ____ Government Agent Sworn | | __x__ Rule 5f warnings given to the govt. | |
| __x__ DETENTION HEARING Held. | | ____ BAIL HEARING Held. | |
| _____ Bond set at $ | | | |
| **Defendant:** __ released ___ held pending satisfaction of bond conditions. | | | |
| ___ Defendant advised of bond conditions set by the Court and signed the bond. | | | |
| ____Surety/ies sworn, advised of bond obligations by the Court and signed the bond.<br>____(Additional) surety/ies to co-sign bond by ______________________________<br>____ After hearing, Court orders detention in custody. _____ Leave to reopen granted. | | | |
| _____ Order scheduling a Detention Hearing entered. | | ___ Bail Hearing set for ______________________ | |
| _____ Preliminary Hearing set for | | ______ Preliminary Hearing waived by defendant | |
| _____ At this time, defense counsel states on the record that the defendant does not have a bail application / package. Order of detention entered with leave to reapply to a Magistrate Judge or to the District Court Judge to whom the case will be assigned. | | | |
| __x__ Order of Excludable Delay/Speedy Trial entered. | | Start Date:10/30/2025 | End Date: 12/8/2025 |
| **Removal District:** | | **Removal District Case Number:** | |
| ____ Removal (Rule 5) Proceeding held. | | | |
| ____ Identity hearing held | | **Court:** ____ Orders removal ____ Denies Removal | |
| ____ Defendant waives Identity hearing | | ____ Defendant waives Preliminary hearing | |
| ____ No bail application presented to the court. Commitment to the District entered. | | | |
| ____ Medical memo issued. | | | |
| ____ Defendant failed to appear; bench warrant issued. | | | |
| __x__ Status conference set for **12/8/2025** @ **4:30pm** before District Judge: DeArcy Hall | | | |
| **Other Rulings:** Defendant arraigned on the Indictment; Bond continued. | | | |
| | | | |
| | | | |
| | | | |

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-v-

SHANE HENNEN

**APPLICATION AND ORDER OF EXCLUDABLE DELAY**

Case No. 25-CR-323

The United States of America and the defendant hereby jointly request that the time period from 10/30/25 to 12/8/25 be excluded from the computation of the time period within which

( ) an information or indictment must be filed, or (XW)
(X) trial of the charges against defendant must commence. (XC)

The parties seek the exclusion of the foregoing period because

(X) they are engaged in plea negotiations, which they believe are likely to result in a disposition of this case without trial, and they require an exclusion of time in order to focus efforts on plea negotiations without the risk that they would not, despite their diligence, have reasonable time for effective preparation for trial,
(X) they need additional time to prepare for trial due to the complexity of case,
( ) ________________.

The defendant states that he/she has been fully advised by counsel of his/her rights guaranteed under the Sixth Amendment to the Constitution; the Speedy Trial Act of 1974, 18 U.S.C. §§ 3161-74; the plan and rules of this Court adopted pursuant to that Act; and Rule 50(b) of the Federal Rules of Criminal Procedure. The defendant understands that he/she has a right to be tried before a jury within a specified time not counting periods excluded.

Defendant

Counsel for Defendant

For U.S. Attorney, E.D.N.Y.

The joint application of the United States of America and the defendant having been heard at a proceeding on the date below, the time period from 10/30/2025 to 12/8/2025 is hereby excluded in computing the time within which ( ) an information or indictment must be filed or (✓) trial must commence. The Court finds that this exclusion of time serves the ends of justice and outweigh the interests of the public and the defendant in a speedy trial for the reasons discussed on the record and because

(✓) given the reasonable likelihood that ongoing plea negotiations will result in a disposition of this case without trial, the exclusion of time will allow all counsel to focus their efforts on plea negotiations without the risk that they would be denied the reasonable time necessary for effective preparation for trial, taking into account the exercise of due diligence.
(✓) exchange and review discovery.

**SO ORDERED.**

**Dated: Brooklyn, N.Y**
October 30, 20 25

s/Taryn A. Merkl, USDJ
United States Magistrate Judge

F. #2024R00288

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

- against - 25-CR-323 (LDH)(JAM)

ERIC EARNEST, et al.,

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

NOTICE OF APPEARANCE

PLEASE TAKE NOTICE that Assistant United States Attorney Kaitlin T. Farrell from this point forward will be added as counsel in the above-captioned matter.

All future correspondence to the United States in the above-captioned matter should be sent to:

Assistant U.S. Attorney Kaitlin T. Farrell
United States Attorney's Office (Criminal Division)
271-A Cadman Plaza East
Brooklyn, New York 11201
Tel: (718) 254-6072
Email: kaitlin.farrell@usdoj.gov

In addition, the Clerk of the Court is respectfully requested to ensure that all future ECF notifications are sent to Assistant United States Attorney Kaitlin T. Farrell at the email address set forth above.

Dated: Brooklyn, New York
November 3, 2025

Respectfully submitted,

JOSEPH NOCELLA, JR.
United States Attorney

By: /s/ Kaitlin T. Farrell
Kaitlin T. Farrell
Assistant U.S. Attorney

cc: Clerk of the Court (LDH)

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

KTF/BW/DIB
F. #2024R00288

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

December 11, 2025

By ECF and E-Mail

The Honorable LaShann DeArcy Hall
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re: United States v. Eric Earnest, et al.
Criminal Docket No. 25-323 (LDH)

Dear Judge DeArcy Hall:

The government respectfully writes to request that the Court so-order the attached Stipulation and Order governing the use and distribution of discovery material by the defendants in the above-captioned case. The government requests that the Court so-order the Stipulation and Order in light of substantial third-party personal information contained in the discovery material in this case. The proposed Stipulation and Order, which has been signed by the parties, is respectfully enclosed for the Court's consideration.

Respectfully submitted,

JOSEPH NOCELLA, JR.
United States Attorney

By: Benjamin Weintraub
Kaitlin Farrell
Benjamin Weintraub
David I. Berman
Assistant United States Attorney
(718) 254-6167

cc: Clerk of Court (LDH) (by ECF and E-Mail)
Counsel of Record (by ECF and E-Mail)

KTF/BW/DIB
F. #2024R00288

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

-against-

ERIC EARNEST, et al.

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

STIPULATION & PROTECTIVE ORDER GOVERNING DISCOVERY

25-CR-323 (LDH)

IT IS HEREBY STIPULATED AND AGREED by the undersigned attorneys and ORDERED by the Court, pursuant to Federal Rule of Criminal Procedure 16(d), that:

1. All material and information disclosed or produced pursuant to Rule 16 of the Federal Rules of Criminal Procedure, pursuant to 18 U.S.C. § 3500, and/or pursuant to Brady v. Maryland, 373 U.S. 83 (1963) and Giglio v. United States, 405 U.S. 150 (1972), to the defendants (the "Defendants"), and the legal defense teams ("Legal Defense Teams"), including defense counsel, by the government in the above-captioned case (hereinafter, the "Discovery Materials") shall be governed by this protective order (the "Protective Order").

a. Any reference to "Defendants" or "Defendant" herein refers individually to each defendant identified in the case 25-CR-323 (LDH).

b. The "Legal Defense Teams" includes Defense Counsel ("Defense Counsel" is defined as counsel of record in this case, including any post-conviction or appellate counsel) and any non-lawyer staff employed or

contracted by Defense Counsel, including investigators, paralegals, support staff, interpreters and expert witnesses who are retained by defense counsel in connection with this case.

2. Discovery Materials, however designated, and any and all copies, notes, transcripts, or documents derived from the Discovery Materials, may be used by the Defendants and the Legal Defense Teams only for the purposes of defending against the charges in the above-captioned case, including but not limited to preparation for trial and any sentencing, appeal, or collateral attack, which was commenced within a year of the exhaustion of the Defendants' appellate rights involving the charges in the above-captioned case.

3. **Rules for the Handling of Discovery Materials:** Except as otherwise provided in this Protective Order, any and all Discovery Materials disclosed or produced to the Defendants and/or the Legal Defense Teams, including the information contained therein, and any copies, notes, transcripts, or documents derived from the Discovery Materials, shall not be disclosed to any persons other than Defendants, the Legal Defense Teams, or the person (potential witness or witness) to whom the Discovery Material directly pertains or his/her counsel, and any persons to whom the Court authorize disclosures at the request of the government or defense counsel;

a. None of the Discovery Materials, nor any copies, notes, transcripts, or documents derived from the Discovery Materials, shall be disseminated to, or discussed with, the media in any form. Nothing in this Protective Order prohibits the media from obtaining copies of any items that become public exhibits at any conference, hearing, trial, or other proceeding.

b. Any person who receives Discovery Materials in connection with this case is prohibited from posting any of those documents or information publicly or to any social media platforms, including, but not limited to Instagram, Snap Chat, YouTube, and Facebook.

c. Prior to sharing Discovery Materials (not designated Sensitive Discovery Materials or Attorneys' Eyes Only) with the Defendants, the Legal Defense Teams must advise the Defendants on the conditions of this Protective Order and his/her obligations pursuant to said Protective Order and remind the Defendants of the consequences of violating the Order. Under the conditions of this Protective Order, the Defendants are prohibited from possessing personal identity information as identified in Rule 49.1 of the Federal Rules of Criminal Procedure or any telephone numbers, email addresses, driver's license numbers, and similar unique identifying information. By signing Attachment A, the Defendants agree to be bound by this Protective Order.

d. If the Defendants obtain substitute counsel, neither the Defendants or the Legal Defense Teams will transfer any portion of the Discovery Materials or any copies, notes, transcripts, documents, or information derived from the Discovery Materials, unless and until such counsel becomes counsel of record, has been provided a copy of this Protective Order, signs Attachment B to this Protective Order, and provides a signed copy of Attachment B to the government. Once substitute counsel has provided a signed copy of Attachment B to the government, and following Defense Counsel's

withdrawal from the above-captioned case, substitute counsel shall assume Defense Counsel's responsibilities under the Protective Order.

4. **Sensitive Discovery Materials**: Any documents, records, or other material specifically identified by the government may be designated as "Sensitive Discovery Material" upon a good-faith belief by the government (or Defense Counsel as it pertains to reciprocal discovery) that such materials contain: identifying information for any potential witness, victim or individual not a party to this litigation; sensitive information of a victim or of a witness; law enforcement sensitive information; information that could implicate the safety of others; information that could impede an ongoing law enforcement investigation; and/or any other information that the government deems in need of heightened protection under this Protective Order. In addition to the protections afforded all Discovery Materials in this case and specifically described in paragraphs 3(a) to 3(d), additional protections for Sensitive Discovery Material include:

a. The Defendants may review Discovery Materials specifically identified by the government as Sensitive Discovery Material only in the presence of the Legal Defense Teams. The Defendants are prohibited from having possession, custody, or control of the Sensitive Discovery Materials, and any and all copies, notes, transcripts, or documents derived from the Sensitive Discovery Material. Under no circumstances may Sensitive Discovery Materials or any and all copies, notes, transcripts, or documents derived from the Sensitive Discovery Material be possessed by the Defendants within a prison facility without the physical presence of a member of the Legal Defense Teams.

b. Defense Counsel agrees that prior to showing Sensitive Discovery Material to the Defendants, a member of the Legal Defense Team will read the Defendants the relevant parts of this Order and remind Defendants of the consequences of violating the Order.

5. **Attorneys' Eyes Only Materials:** Any documents, material, or information may be designated Attorneys' Eyes Only Material only upon a good-faith belief by the government (or Defense Counsel as it pertains to reciprocal discovery) that designation as Sensitive Discovery Material provides insufficient protection to such materials.

6. **Limitations on Sharing and Dissemination of Attorneys' Eyes Only Material:** In addition to the protections afforded all discovery materials in this case and specifically described in paragraphs 3(a) to 3(d), the additional protections for materials specifically identified by the government as Attorneys' Eyes Only Material include:

a. Attorneys' Eyes Only Material may be reviewed only by the Legal Defense Teams, as defined in paragraphs 1 and 2 above, respectively. Attorneys' Eyes Only Material may not be disseminated to or reviewed by any other person, including the Defendants.

b. Attorneys' Eyes Only Material may be shared with the Defendants under the constraints applicable to Sensitive Discovery Materials two weeks before trial and only in person, unless the government shows good cause why it should not be shared or why sharing should be delayed.

7. **Designation of Sensitive Discovery Material or Attorney's Eyes Only Material:** Any documents, material, or information determined to be Sensitive Discovery Material or Attorneys' Eyes Only Material may be so designated by stamping the legend

"SENSITIVE" or "SENSITIVE-ATTORNEYS' EYES ONLY" on the document, including all pages and attachments. Where electronic files or documents are produced in a format that makes stamping impractical, such files and documents may be designated by appending to the media on which such a file or documents are produced, file name, or to the electronic folder in which the file is located, information indicating that the file contains Sensitive Discovery Material or Attorneys' Eyes Only material.

8. **Disputes Regarding Sensitive Discovery Material and Attorneys' Eyes Only Material:** The parties shall make a good faith effort to resolve any dispute about a sensitivity designation before requesting the Court's intervention. The United States may agree to remove or reduce a sensitivity designation without further order of this Court. Whenever the redaction of specified information will resolve the basis for which a sensitivity designation was applied, the government will agree to redaction, and such redaction will render the materials no longer subject to heightened protection under this Order. Any agreement to reduce or remove a sensitivity designation or to redact specific information shall be memorialized in writing. If the government and Defense Counsel do not agree that certain material should be designated as Sensitive Discovery Material or Attorneys' Eyes Only Material, Defense Counsel may provide notice to the government and a reasoned explanation regarding why Defense Counsel does not believe the materials require treatment as either Sensitive Discovery Material or Attorneys' Eyes Only Material. To the extent the parties do not agree, either party—upon providing notice of the intent to make such an application—may apply to the Court to determine whether the material should be treated as Sensitive Discovery Material or Attorneys' Eyes Only Material. Defense Counsel shall treat the material originally designated as Sensitive Discovery Material or

Attorneys' Eyes Only Material with the protections afforded those designations pending any determination by the Court.

9. **Court Filings and Court Hearings:** Absent prior agreement by the parties or permission from the Court, no party shall disclose materials designated as Sensitive Discovery Material or Attorney's Eyes Only Material in any public filing with the Court. Such materials shall be submitted under seal in accordance with Eastern District of New York Local Rule 49(f)(6). The Clerk of Court shall accept for filing under seal any filings made in compliance with that Rule and so marked by the parties pursuant to this Order. The restrictions in this Order shall not limit either party in the use of the materials in judicial proceedings in this case. The procedures for use of designated Sensitive and Attorneys' Eyes Only Materials during any hearing or the trial of this matter shall be determined by the parties and the Court in advance of the hearing or trial. No party shall disclose materials designated Sensitive Discovery Materials or Attorneys' Eyes Only Materials in open court without agreement by the parties that such materials may be disclosed in open court or prior authorization by the Court.

10. The Defendants and Defense Counsel will return to the government the Sensitive Discovery Material and the Attorneys' Eyes Only Material and all copies thereof, whether in the possession of Defense Counsel, the Legal Defense Teams, or any other signatory to Attachment B to this Protective Order, when the Defendants conclude all efforts to defend against the charges in the above-captioned case and any superseding indictment, including but not limited to preparing for trial and any sentencing, appeal, or collateral attack, which was commenced within a year of the exhaustion of the Defendants' appellate rights involving the charges in the above-captioned case.

11. Nothing in this Protective Order shall preclude the government or the Defendants from seeking a further order pursuant to Rule 16(d).

12. Nothing in this Protective Order in any way releases counsel for the government or Defense Counsel from the obligations of the "Free Press Fair Trial Directives" of Local Rule 23.1 of the Local Criminal Rules of the Eastern District of New York.

13. In the event the terms of this Protective Order are violated, Defense Counsel or the government shall advise the Court and opposing counsel immediately of the nature and circumstances of such violation.

14. Counsel for each of the Defendants shall execute their respective attached signature page for this Order.

15. This Court shall retain jurisdiction over all persons subject to this Order to the extent necessary to enforce any obligations arising hereunder or to impose sanctions for any contempt thereof.

Dated: Brooklyn, New York
December 11, 2025

JOSEPH NOCELLA, JR.
United States Attorney
Eastern District of New York

By: Benjamin Weintraub
Kaitlin T. Farrell
Benjamin Weintraub
David I. Berman
Assistant U.S. Attorneys
(718) 254-7000

SO ORDERED

HON. LASHANN DEARCY HALL
UNITED STATES DISTRICT JUDGE
EASTERN DISTRICT OF NEW YORK

Attorney for Eric Earnest

______________________________

Peter E. Brill, Esq.

Attorney for Marves Fairley

______________________

Eric W. Siegle, Esq.

Attorney for Shanne Hennen

______________________

Todd Leventhal, Esq.

Attorney for Damon Jones

Kenneth Montgomery, Esq.

Attorney for Deniro Laster

Evan Corcoran, Esq.

Attorney for Terry Rozier

______________________________
Jim Trusty, Esq.

# ATTACHMENT A

## Defendant's Acceptance

I have read this Protective Order and carefully reviewed every part of it with my attorney. I am fully satisfied with the legal services provided by my attorney in connection with this Protective Order and all matters relating to it. I fully understand this Protective Order and voluntarily agree to it. No threats have been made to me, nor am I under the influence of anything that could impede my ability to understand this Protective Order fully.

12/10/2025
Date

ID VfGGrdip93rGvCdEAB622WT7
Defendant Signature

Eric Earnest
Defendant Printed Name

## ATTACHMENT A

### Defendant's Acceptance

I have read this Protective Order and carefully reviewed every part of it with my attorney. I am fully satisfied with the legal services provided by my attorney in connection with this Protective Order and all matters relating to it. I fully understand this Protective Order and voluntarily agree to it. No threats have been made to me, nor am I under the influence of anything that could impede my ability to understand this Protective Order fully.

12.8.25
Date

x [signature]
Defendant Signature

MARVES FAIRLEY
Defendant Printed Name

# ATTACHMENT A

## Defendant's Acceptance

I have read this Protective Order and carefully reviewed every part of it with my attorney. I am fully satisfied with the legal services provided by my attorney in connection with this Protective Order and all matters relating to it. I fully understand this Protective Order and voluntarily agree to it. No threats have been made to me, nor am I under the influence of anything that could impede my ability to understand this Protective Order fully.

12/10/25
Date

[signature]
Defendant Signature

Shane Hennen
Defendant Printed Name

## ATTACHMENT A

**Defendant's Acceptance**

I have read this Protective Order and carefully reviewed every part of it with my attorney. I am fully satisfied with the legal services provided by my attorney in connection with this Protective Order and all matters relating to it. I fully understand this Protective Order and voluntarily agree to it. No threats have been made to me, nor am I under the influence of anything that could impede my ability to understand this Protective Order fully.

12/1/25
Date

Defendant Signature

DAMON JONES
Defendant Printed Name

## ATTACHMENT A

**Defendant's Acceptance**

I have read this Protective Order and carefully reviewed every part of it with my attorney. I am fully satisfied with the legal services provided by my attorney in connection with this Protective Order and all matters relating to it. I fully understand this Protective Order and voluntarily agree to it. No threats have been made to me, nor am I under the influence of anything that could impede my ability to understand this Protective Order fully.

12-08-2025
Date

[signature]
Defendant Signature

De'Niro Laster
Defendant Printed Name

**ATTACHMENT A**

**Defendant's Acceptance**

I have read this Protective Order and carefully reviewed every part of it with my attorney. I am fully satisfied with the legal services provided by my attorney in connection with this Protective Order and all matters relating to it. I fully understand this Protective Order and voluntarily agree to it. No threats have been made to me, nor am I under the influence of anything that could impede my ability to understand this Protective Order fully.

12/9/25
Date

[signature]
Defendant Signature

Terry Rozier
Defendant Printed Name

**ATTACHMENT B**

I have read the attached Protective Order in the matter of United States v. Earnest, et al., No. 25-CR-323 (LDH), and, by my signature below, agree to be bound by its terms.

| Printed Name | Signature |
| --- | --- |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

KTF/BW/DIB
F. #2024R00288

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

-against-

ERIC EARNEST, et al.

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - X

STIPULATION & PROTECTIVE ORDER GOVERNING DISCOVERY

25-CR-323 (LDH)

IT IS HEREBY STIPULATED AND AGREED by the undersigned attorneys and ORDERED by the Court, pursuant to Federal Rule of Criminal Procedure 16(d), that:

1. All material and information disclosed or produced pursuant to Rule 16 of the Federal Rules of Criminal Procedure, pursuant to 18 U.S.C. § 3500, and/or pursuant to Brady v. Maryland, 373 U.S. 83 (1963) and Giglio v. United States, 405 U.S. 150 (1972), to the defendants (the "Defendants"), and the legal defense teams ("Legal Defense Teams"), including defense counsel, by the government in the above-captioned case (hereinafter, the "Discovery Materials") shall be governed by this protective order (the "Protective Order").

a. Any reference to "Defendants" or "Defendant" herein refers individually to each defendant identified in the case 25-CR-323 (LDH).

b. The "Legal Defense Teams" includes Defense Counsel ("Defense Counsel" is defined as counsel of record in this case, including any post-conviction or appellate counsel) and any non-lawyer staff employed or

contracted by Defense Counsel, including investigators, paralegals, support staff, interpreters and expert witnesses who are retained by defense counsel in connection with this case.

2. Discovery Materials, however designated, and any and all copies, notes, transcripts, or documents derived from the Discovery Materials, may be used by the Defendants and the Legal Defense Teams only for the purposes of defending against the charges in the above-captioned case, including but not limited to preparation for trial and any sentencing, appeal, or collateral attack, which was commenced within a year of the exhaustion of the Defendants' appellate rights involving the charges in the above-captioned case.

3. **Rules for the Handling of Discovery Materials:** Except as otherwise provided in this Protective Order, any and all Discovery Materials disclosed or produced to the Defendants and/or the Legal Defense Teams, including the information contained therein, and any copies, notes, transcripts, or documents derived from the Discovery Materials, shall not be disclosed to any persons other than Defendants, the Legal Defense Teams, or the person (potential witness or witness) to whom the Discovery Material directly pertains or his/her counsel, and any persons to whom the Court authorize disclosures at the request of the government or defense counsel;

a. None of the Discovery Materials, nor any copies, notes, transcripts, or documents derived from the Discovery Materials, shall be disseminated to, or discussed with, the media in any form. Nothing in this Protective Order prohibits the media from obtaining copies of any items that become public exhibits at any conference, hearing, trial, or other proceeding.

b. Any person who receives Discovery Materials in connection with this case is prohibited from posting any of those documents or information publicly or to any social media platforms, including, but not limited to Instagram, Snap Chat, YouTube, and Facebook.

c. Prior to sharing Discovery Materials (not designated Sensitive Discovery Materials or Attorneys' Eyes Only) with the Defendants, the Legal Defense Teams must advise the Defendants on the conditions of this Protective Order and his/her obligations pursuant to said Protective Order and remind the Defendants of the consequences of violating the Order. Under the conditions of this Protective Order, the Defendants are prohibited from possessing personal identity information as identified in Rule 49.1 of the Federal Rules of Criminal Procedure or any telephone numbers, email addresses, driver's license numbers, and similar unique identifying information. By signing Attachment A, the Defendants agree to be bound by this Protective Order.

d. If the Defendants obtain substitute counsel, neither the Defendants or the Legal Defense Teams will transfer any portion of the Discovery Materials or any copies, notes, transcripts, documents, or information derived from the Discovery Materials, unless and until such counsel becomes counsel of record, has been provided a copy of this Protective Order, signs Attachment B to this Protective Order, and provides a signed copy of Attachment B to the government. Once substitute counsel has provided a signed copy of Attachment B to the government, and following Defense Counsel's

withdrawal from the above-captioned case, substitute counsel shall assume Defense Counsel's responsibilities under the Protective Order.

4. **Sensitive Discovery Materials**: Any documents, records, or other material specifically identified by the government may be designated as "Sensitive Discovery Material" upon a good-faith belief by the government (or Defense Counsel as it pertains to reciprocal discovery) that such materials contain: identifying information for any potential witness, victim or individual not a party to this litigation; sensitive information of a victim or of a witness; law enforcement sensitive information; information that could implicate the safety of others; information that could impede an ongoing law enforcement investigation; and/or any other information that the government deems in need of heightened protection under this Protective Order. In addition to the protections afforded all Discovery Materials in this case and specifically described in paragraphs 3(a) to 3(d), additional protections for Sensitive Discovery Material include:

a. The Defendants may review Discovery Materials specifically identified by the government as Sensitive Discovery Material only in the presence of the Legal Defense Teams. The Defendants are prohibited from having possession, custody, or control of the Sensitive Discovery Materials, and any and all copies, notes, transcripts, or documents derived from the Sensitive Discovery Material. Under no circumstances may Sensitive Discovery Materials or any and all copies, notes, transcripts, or documents derived from the Sensitive Discovery Material be possessed by the Defendants within a prison facility without the physical presence of a member of the Legal Defense Teams.

b. Defense Counsel agrees that prior to showing Sensitive Discovery Material to the Defendants, a member of the Legal Defense Team will read the Defendants the relevant parts of this Order and remind Defendants of the consequences of violating the Order.

5. **Attorneys' Eyes Only Materials:** Any documents, material, or information may be designated Attorneys' Eyes Only Material only upon a good-faith belief by the government (or Defense Counsel as it pertains to reciprocal discovery) that designation as Sensitive Discovery Material provides insufficient protection to such materials.

6. **Limitations on Sharing and Dissemination of Attorneys' Eyes Only Material:** In addition to the protections afforded all discovery materials in this case and specifically described in paragraphs 3(a) to 3(d), the additional protections for materials specifically identified by the government as Attorneys' Eyes Only Material include:

a. Attorneys' Eyes Only Material may be reviewed only by the Legal Defense Teams, as defined in paragraphs 1 and 2 above, respectively. Attorneys' Eyes Only Material may not be disseminated to or reviewed by any other person, including the Defendants.

b. Attorneys' Eyes Only Material may be shared with the Defendants under the constraints applicable to Sensitive Discovery Materials two weeks before trial and only in person, unless the government shows good cause why it should not be shared or why sharing should be delayed.

7. **Designation of Sensitive Discovery Material or Attorney's Eyes Only Material:** Any documents, material, or information determined to be Sensitive Discovery Material or Attorneys' Eyes Only Material may be so designated by stamping the legend

"SENSITIVE" or "SENSITIVE-ATTORNEYS' EYES ONLY" on the document, including all pages and attachments. Where electronic files or documents are produced in a format that makes stamping impractical, such files and documents may be designated by appending to the media on which such a file or documents are produced, file name, or to the electronic folder in which the file is located, information indicating that the file contains Sensitive Discovery Material or Attorneys' Eyes Only material.

8. **Disputes Regarding Sensitive Discovery Material and Attorneys' Eyes Only Material:** The parties shall make a good faith effort to resolve any dispute about a sensitivity designation before requesting the Court's intervention. The United States may agree to remove or reduce a sensitivity designation without further order of this Court. Whenever the redaction of specified information will resolve the basis for which a sensitivity designation was applied, the government will agree to redaction, and such redaction will render the materials no longer subject to heightened protection under this Order. Any agreement to reduce or remove a sensitivity designation or to redact specific information shall be memorialized in writing. If the government and Defense Counsel do not agree that certain material should be designated as Sensitive Discovery Material or Attorneys' Eyes Only Material, Defense Counsel may provide notice to the government and a reasoned explanation regarding why Defense Counsel does not believe the materials require treatment as either Sensitive Discovery Material or Attorneys' Eyes Only Material. To the extent the parties do not agree, either party—upon providing notice of the intent to make such an application—may apply to the Court to determine whether the material should be treated as Sensitive Discovery Material or Attorneys' Eyes Only Material. Defense Counsel shall treat the material originally designated as Sensitive Discovery Material or

Attorneys' Eyes Only Material with the protections afforded those designations pending any determination by the Court.

9. **Court Filings and Court Hearings:** Absent prior agreement by the parties or permission from the Court, no party shall disclose materials designated as Sensitive Discovery Material or Attorney's Eyes Only Material in any public filing with the Court. Such materials shall be submitted under seal in accordance with Eastern District of New York Local Rule 49(f)(6). The Clerk of Court shall accept for filing under seal any filings made in compliance with that Rule and so marked by the parties pursuant to this Order. The restrictions in this Order shall not limit either party in the use of the materials in judicial proceedings in this case. The procedures for use of designated Sensitive and Attorneys' Eyes Only Materials during any hearing or the trial of this matter shall be determined by the parties and the Court in advance of the hearing or trial. No party shall disclose materials designated Sensitive Discovery Materials or Attorneys' Eyes Only Materials in open court without agreement by the parties that such materials may be disclosed in open court or prior authorization by the Court.

10. The Defendants and Defense Counsel will return to the government the Sensitive Discovery Material and the Attorneys' Eyes Only Material and all copies thereof, whether in the possession of Defense Counsel, the Legal Defense Teams, or any other signatory to Attachment B to this Protective Order, when the Defendants conclude all efforts to defend against the charges in the above-captioned case and any superseding indictment, including but not limited to preparing for trial and any sentencing, appeal, or collateral attack, which was commenced within a year of the exhaustion of the Defendants' appellate rights involving the charges in the above-captioned case.

11. Nothing in this Protective Order shall preclude the government or the Defendants from seeking a further order pursuant to Rule 16(d).

12. Nothing in this Protective Order in any way releases counsel for the government or Defense Counsel from the obligations of the "Free Press Fair Trial Directives" of Local Rule 23.1 of the Local Criminal Rules of the Eastern District of New York.

13. In the event the terms of this Protective Order are violated, Defense Counsel or the government shall advise the Court and opposing counsel immediately of the nature and circumstances of such violation.

14. Counsel for each of the Defendants shall execute their respective attached signature page for this Order.

15. This Court shall retain jurisdiction over all persons subject to this Order to the extent necessary to enforce any obligations arising hereunder or to impose sanctions for any contempt thereof.

Dated: Brooklyn, New York
December 11, 2025

JOSEPH NOCELLA, JR.
United States Attorney
Eastern District of New York

By: Benjamin Weintraub
Kaitlin T. Farrell
Benjamin Weintraub
David I. Berman
Assistant U.S. Attorneys
(718) 254-7000

SO ORDERED

s/**LDH** 12/23/2025
HON. LASHANN DEARCY HALL
UNITED STATES DISTRICT JUDGE
EASTERN DISTRICT OF NEW YORK

Attorney for Eric Earnest

______________________________
Peter E. Brill, Esq.

Attorney for Marves Fairley

Eric W. Siegle, Esq.

Attorney for Shanne Hennen

Todd Leventhal, Esq.

Attorney for Damon Jones

Kenneth Montgomery, Esq.

Attorney for Deniro Laster

Evan Corcoran, Esq.

Attorney for Terry Rozier

______________________________
Jim Trusty, Esq.

# ATTACHMENT A

## Defendant's Acceptance

I have read this Protective Order and carefully reviewed every part of it with my attorney. I am fully satisfied with the legal services provided by my attorney in connection with this Protective Order and all matters relating to it. I fully understand this Protective Order and voluntarily agree to it. No threats have been made to me, nor am I under the influence of anything that could impede my ability to understand this Protective Order fully.

12/10/2025
Date

ID VfGGrdip93rGvCdEAB622WT7
Defendant Signature

Eric Earnest
Defendant Printed Name

## ATTACHMENT A

**Defendant's Acceptance**

I have read this Protective Order and carefully reviewed every part of it with my attorney. I am fully satisfied with the legal services provided by my attorney in connection with this Protective Order and all matters relating to it. I fully understand this Protective Order and voluntarily agree to it. No threats have been made to me, nor am I under the influence of anything that could impede my ability to understand this Protective Order fully.

12.8.25

Date

x

Defendant Signature

MARVES FAIRLEY

Defendant Printed Name

## ATTACHMENT A

**Defendant's Acceptance**

I have read this Protective Order and carefully reviewed every part of it with my attorney. I am fully satisfied with the legal services provided by my attorney in connection with this Protective Order and all matters relating to it. I fully understand this Protective Order and voluntarily agree to it. No threats have been made to me, nor am I under the influence of anything that could impede my ability to understand this Protective Order fully.

12/10/25
Date

[signature]
Defendant Signature

Shane Hennen
Defendant Printed Name

## ATTACHMENT A

**Defendant's Acceptance**

I have read this Protective Order and carefully reviewed every part of it with my attorney. I am fully satisfied with the legal services provided by my attorney in connection with this Protective Order and all matters relating to it. I fully understand this Protective Order and voluntarily agree to it. No threats have been made to me, nor am I under the influence of anything that could impede my ability to understand this Protective Order fully.

12/1/25
Date

Defendant Signature

DAMON JONES
Defendant Printed Name

## ATTACHMENT A

**Defendant's Acceptance**

I have read this Protective Order and carefully reviewed every part of it with my attorney. I am fully satisfied with the legal services provided by my attorney in connection with this Protective Order and all matters relating to it. I fully understand this Protective Order and voluntarily agree to it. No threats have been made to me, nor am I under the influence of anything that could impede my ability to understand this Protective Order fully.

12-08-2025
Date

[signature]
Defendant Signature

De'Niro Laster
Defendant Printed Name

## ATTACHMENT A

**Defendant's Acceptance**

I have read this Protective Order and carefully reviewed every part of it with my attorney. I am fully satisfied with the legal services provided by my attorney in connection with this Protective Order and all matters relating to it. I fully understand this Protective Order and voluntarily agree to it. No threats have been made to me, nor am I under the influence of anything that could impede my ability to understand this Protective Order fully.

12/9/25
Date

[signature]
Defendant Signature

Terry Rozier
Defendant Printed Name

**ATTACHMENT B**

I have read the attached Protective Order in the matter of United States v. Earnest, et al., No. 25-CR-323 (LDH), and, by my signature below, agree to be bound by its terms.

| Printed Name | Signature |
|---|---|
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

KTF
F. #2024R00288

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

May 14, 2026

By ECF

The Honorable LaShann DeArcy Hall
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re: United States v. Eric Earnest, et al.
Criminal Docket No. 25-323 (LDH)

Dear Judge DeArcy Hall:

The government writes on behalf of the parties to inform the Court that, pursuant to the Court's order dated May 8, 2026, the parties, with the exception of defendant Shane Hennen,[1] consent to the exclusion of time until June 10, 2026 under the Speedy Trial Act. The government submits that exclusion is in the interests of justice because of ongoing plea negotiations and discovery productions and review.

Additionally, during our last court appearance, the Court asked the government when it intends to supersede the above-captioned indictment. Although the government

[1] The government requested the defendants' positions via email on May 9, 2026. As of May 14, 2026, at 8:05 pm, the government has not received a response from counsel for Mr. Hennen.

previously anticipated doing so this week, because of scheduling issues, the government now anticipates doing so next week.

Respectfully submitted,

JOSEPH NOCELLA, JR.
United States Attorney

By: /s/
Kaitlin Farrell
Assistant United States Attorney
(718) 254-6072

cc: Clerk of Court (LDH) (by ECF)
Counsel of Record (by ECF)

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT
E.D.N.Y.
*MAY 28, 2026*
BROOKLYN OFFICE

JPL:KTF/BLW/DIB
F. #2024R00288

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

- against -

ERIC EARNEST,
also known as "Spook,"
SHANE HENNEN,
also known as "Sugar,"
DENIRO LASTER,
also known as "Niro," "Payso"
and "Peso," and
TERRY ROZIER,
also known as "Scary Terry" and
"Chum,"

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

S U P E R S E D I N G
I N D I C T M E N T

Cr. No. 25-CR-323 (S-1) (LDH)
(T. 18, U.S.C., §§ 224, 981(a)(1)(C), 982(a)(1), 982(b)(1), 1349, 1956(h), 2 and 3551 et seq.; T. 21, U.S.C., § 853(p); T. 28, U.S.C., § 2461(c))

THE GRAND JURY CHARGES:

## INTRODUCTION

At all times relevant to this Indictment, unless otherwise indicated:

### I. The Defendants and Relevant Entities and Individuals

#### A. The Defendants

1. The defendant ERIC EARNEST, also known as "Spook," was a resident of Missouri.

2. The defendant SHANE HENNEN, also known as "Sugar," was a resident of Pennsylvania and Nevada. HENNEN represented himself on Instagram as a successful sports bettor and sold sports betting picks through his Instagram profiles.

3. The defendant DENIRO LASTER, also known as "Peso," "Payso" and "Niro," was a resident of Ohio.

4. The defendant TERRY ROZIER, also known as "Scary Terry" and "Chum," was a resident of Ohio, North Carolina and Florida. ROZIER was a professional basketball player who has played in the National Basketball Association ("NBA") since 2015. During the 2022-2023 NBA season, ROZIER played for the Charlotte Hornets. ROZIER was close friends with the defendant DENIRO LASTER, and they had known each other since childhood.

B. The NBA and the Betting Companies

5. The NBA was a professional basketball league in North America. Among others, NBA teams included the Charlotte Hornets, Chicago Bulls, Cleveland Cavaliers, Los Angeles Clippers, Los Angeles Lakers, Milwaukee Bucks, New Orleans Pelicans, Oklahoma City Thunder, Orlando Magic, Philadelphia 76ers, Portland Trail Blazers, Sacramento Kings and Toronto Raptors. The NBA maintained codes of conduct applicable to its players, coaches and management that prohibited, among other things, wagering in connection with NBA games or providing non-public information relating to NBA games to others. Such codes of conduct also required NBA players, coaches and management to provide their best services and loyalty to their teams. In addition, the Collective Bargaining Agreement and Uniform Player Contract, which applied to all NBA players, including the defendant TERRY ROZIER, required players to "refrain from gambling on NBA games, point shaving or other attempts to fix the score or outcome of an NBA game, or providing confidential team or league information to individuals involved in gambling."

6. NBA teams were required to report to the NBA information concerning player injuries, illnesses and rest for all NBA games. On each gameday, the NBA disseminated an "injury report" for each NBA team playing that day. The injury reports identified players as falling within one of the following categories: "available," "probable," "questionable," "doubtful" and "out." The injury reports were updated multiple times throughout each gameday.

7. Betting Companies 1 through 4, entities the identities of which are known to the Grand Jury, were licensed gambling companies operating in the United States that offered sports betting services (collectively, and together with other online sportsbooks and retail sportsbooks, the "Betting Companies"). The Betting Companies offered sports betting services relating to, among other things, NBA games and individual players' statistical performances in NBA games. Since approximately 2021, Betting Company 1 and Betting Company 2 have been the co-official sports betting partners of the NBA.

C. Other Relevant Individuals

8. Long Phi Pham, also known as "Bruce," was a resident of Queens, New York.

9. Timothy McCormack was a resident of New York, New York.

10. Jontay Porter was a resident of Missouri. Porter was an NBA player during the 2023-2024 NBA season.

11. Marves Fairley, also known as "Vez," "Vezino" and "Vezino Locks," was a resident of Mississippi. Fairley represented himself on Instagram as a successful sports bettor and sold sports betting picks through his Instagram profiles.

12. Damon Jones, also known as "D Jones" and "Dee Jones," was a resident of Texas. Jones was an NBA player from approximately 1999 through 2009 and an NBA coach from approximately 2016 through 2018.

13. Co-Conspirator 1, an individual whose identity is known to the Grand Jury, was a resident of Florida. Co-Conspirator 1 was at times an NBA player.

14. Co-Conspirator 2, an individual whose identity is known to the Grand Jury, was a resident of Pennsylvania.

15. Co-Conspirator 3, an individual whose identity is known to the Grand Jury, was a resident of Louisiana.

16. Co-Conspirator 4, an individual whose identity is known to the Grand Jury, was a resident of Michigan.

17. Co-Conspirator 5, an individual whose identity is known to the Grand Jury, was a resident of Pennsylvania. Co-Conspirator 5 was a relative of the defendant SHANE HENNEN.

18. Co-Conspirator 6, an individual whose identity is known to the Grand Jury, was a resident of Ohio. Co-Conspirator 6 was a relative of the defendant TERRY ROZIER.

19. Co-Conspirator 7, an individual whose identity is known to the Grand Jury, was a resident of North Carolina. Co-Conspirator 7 was a relative of the defendant DENIRO LASTER.

20. Co-Conspirator 8, an individual whose identity is known to the Grand Jury, was a resident Oregon. Co-Conspirator 8 was an NBA player from approximately 1997 through 2014, and an NBA coach since at least 2021.

21. Co-Conspirator 9, an individual whose identity is known to the Grand Jury, was a resident of Brooklyn, New York.

II. Background on Sports Betting

22. In or about 1992, following several high-profile sports-betting scandals, the United States Congress passed the federal Professional and Amateur Sports Protection Act ("PASPA"), 28 U.S.C. § 3702, which banned all but four states from sponsoring, authorizing, operating or regulating sports wagering. The four excepted states—Nevada, Oregon, Delaware and Montana—had existing sports wagering regimes that PASPA grandfathered in.

23. In or about 2018, following years of litigation between the State of New Jersey—which desired to legalize sports betting—and several major American professional and college sports leagues, the United States Supreme Court struck down PASPA as unconstitutional. In the ensuing years, sports betting, and particularly online sports betting, became legal in dozens of states.

24. The Betting Companies operated online mobile applications, branded retail sportsbooks at various casinos nationwide, or both. Online wagers made through the Betting Companies' online mobile applications were made pursuant to the Betting Companies' respective terms of use. Wagers made at retail sportsbooks were made pursuant to the sportsbooks' house rules. Among other things, the terms of use and house rules generally prohibited users from wagering in connection with sporting contests when the wagers were based on or the users had access to pre-release, confidential information or other non-public information. The terms of use and house rules also prohibited individuals from using others to place wagers on their behalf, otherwise known as straw betting.

25. Despite the recent widespread legalization of sports betting, unlicensed bookmakers or "bookies" also offered sports betting services to bettors. Bookies frequently accepted bets on bespoke betting websites that allowed users to place various types of wagers on sporting contests based on publicly available betting lines. Unlike legal sportsbooks, bookies typically "settled up" the bettors' wagers (i.e., received payment from and/or paid the bettors in connection with the wagers) offline, generally through cash, peer-to-peer payments or cryptocurrency transactions.

26. A "proposition" or "prop" bet was a bet made regarding the occurrence or non-occurrence during a game of an event not directly affecting the game's outcome. For example, a bettor might wager that a particular player would score more (referred to as betting the "over") or fewer (referred to as betting the "under") points than a certain number of points designated by the betting operator for a given game. Prop bets took many forms. For example, a bettor could place prop bets on the points, rebounds, assists, minutes played and/or three-pointers made by individual NBA players.

27. A "money line" bet was a bet placed on a game's outcome (i.e., which team would win or lose the game). Relatedly, a "point spread" or "spread" bet was a bet placed on the margin of victory or defeat in a given game.

28. A "parlay" bet was a bet that was comprised of two or more individual bets (as opposed to a "single" or "straight" bet, which was comprised of one individual bet). For a bettor to win a parlay bet, each bet, or "leg," within the parlay bet had to be successful.

29. A "betting line" or "line" was a number set by oddsmakers to represent the expected outcome of a particular event. In the context of prop bets, a betting line was the number set by oddsmakers for a given outcome. For example, an oddsmaker might set the

betting line for a given player's points in a given game at 20. Bettors would then have the choice to bet the "under" (i.e., that the player will score fewer than 20 points in the game), or the "over" (i.e., that the player will score more than 20 points). Oddsmakers had proprietary processes for setting betting lines, but betting lines generally took into account all publicly known information relevant to a given bet.

III. The Fraudulent Wagering Scheme

30. In or about and between December 2022 and March 2024, the defendants ERIC EARNEST, SHANE HENNEN, DENIRO LASTER and TERRY ROZIER, together with others, participated in a scheme to defraud the Betting Companies by providing, obtaining and using non-public information relating to NBA games to place and cause others to place fraudulent sports wagers for profit, and to launder the proceeds thereof.

31. The fraudulent wagering scheme typically involved various iterations of the same pattern within a network of co-conspirators. The defendants and certain co-conspirators had access to private information known by NBA players or NBA coaches that was likely to affect the outcome of upcoming NBA games or individual players' performances. They provided other co-conspirators this non-public information—in exchange for either a flat fee or a share in expected wagering profits—for the purpose of betting. The co-conspirators disseminated the non-public betting information through a network of individuals who placed bets on the co-conspirators' behalf, placed wagers on their own behalf, or directed others to place wagers, all with the intention of profiting off the scheme at the expense of the Betting Companies. As a result, many of the wagers were placed in connection with betting lines that did not reflect or account for the private information known by the defendants and their co-conspirators, rendering the wagers more profitable.

32. The defendants and their co-conspirators placed and caused others to place these fraudulent wagers through the Betting Companies' mobile applications and retail sportsbooks. In doing so, the defendants and their co-conspirators made and caused others to make materially false and misleading statements and representations to the Betting Companies, and to omit to state one or more material facts which made what was represented under the circumstances misleading, including that the wagers were placed in accordance with the Betting Companies' terms and conditions and house rules prohibiting, among other things, wagering based on non-public information and straw betting.

33. In many instances, the defendants and their co-conspirators' fraudulent bets were successful and were paid out by the Betting Companies. The Betting Companies would not have paid bettors for successful wagers had they known that the bettors possessed non-public information pertaining to the event or were placing the wagers at the direction of and for the benefit of others.

34. In furtherance of the scheme and to conceal the proceeds derived from it, the defendants and their co-conspirators engaged in and caused others to engage in transactions between and among themselves and others acting on their behalf including peer-to-peer payment platform transfers, bank wires and cash exchanges.

35. In addition to the scheme described above, the defendants TERRY ROZIER, DENIRO LASTER and SHANE HENNEN, together with others, engaged in a scheme to defraud the Charlotte Hornets and the NBA of honest and faithful services of ROZIER through bribery. In furtherance of the scheme, ROZIER, together with others, negotiated and accepted a bribe to withdraw himself from a game early so that co-conspirators could bet on his anticipated underperformance.

36. Examples of some of the fraudulent wagers and the laundering of proceeds thereof are set forth below.

A. The March 23, 2023 Charlotte Hornets Game

37. During the 2022-2023 NBA season, the defendant TERRY ROZIER played for the Charlotte Hornets. Towards the end of the season, ROZIER suffered a lower leg injury and, although he continued to play with the injury, planned to use the injury as a basis to withdraw early during an upcoming game. In exchange for an approximately $100,000 bribe, ROZIER agreed with co-conspirators, including the defendant DENIRO LASTER, Marves Fairley and Co-Conspirator 1, that ROZIER would withdraw early from a to-be-determined game purportedly on the basis of his injury so that co-conspirators could bet on the information before it became public. ROZIER also agreed to give LASTER a portion of the bribe. LASTER communicated with Fairley and Co-Conspirator 1 using encrypted applications to keep them updated as the anticipated game grew closer. Meanwhile, Fairley and the defendant SHANE HENNEN lined up individuals who were poised to bet on the inside information once ROZIER identified the particular game he would withdraw from.

38. Shortly before the Hornets' March 23, 2023 game against the New Orleans Pelicans (the "March 23 Game"), the defendant TERRY ROZIER informed the defendant DENIRO LASTER that ROZIER was going to prematurely remove himself from the game in the first quarter due to the injury and not return to play further. ROZIER provided this information to LASTER for the purpose of enabling LASTER and others to place wagers based on this information. ROZIER was not on the Hornets' injury report prior to the March 23 Game, and NBA and Hornets officials were not aware of ROZIER's plan to exit the game

prematurely. The public, including the Betting Companies, was also not aware of ROZIER's plan to exit the March 23 Game prematurely.

39. Consistent with their predetermined bribe arrangement, the defendant DENIRO LASTER passed on the information about the defendant TERRY ROZIER's plan to leave the March 23 Game early to multiple co-conspirators, including Marves Fairley and Co-Conspirator 1, to enable them to place fraudulent wagers based on the non-public information. Prior to the March 23 Game, Fairley, LASTER and Co-Conspirator 1 exchanged text messages confirming that ROZIER planned to exit this particular game prematurely and confirming their plan to place wagers on ROZIER's unders (i.e., that ROZIER would underperform relative to the oddsmakers' betting lines for his individual performance).

40. Marves Fairley also provided the information to the defendant SHANE HENNEN so that HENNEN, both himself and through a network of straw bettors, could place bets on the defendant TERRY ROZIER's unders. Fairley provided the information to HENNEN and HENNEN agreed to place and direct his associates to place bets on ROZIER's unders based on an agreement that HENNEN would give Fairley a share of the profits from his and his associates' winning bets.

41. On or about March 23, 2023 and prior to the start of the March 23 Game, the defendant SHANE HENNEN placed multiple bets at a retail sportsbook operated by Betting Company 3 totaling approximately $61,200, all of which were either straight or parlay bets on the defendant TERRY ROZIER's unders. In addition to placing bets on ROZIER's unders himself, HENNEN marshalled a network of associates to place bets on ROZIER's unders at HENNEN's direction, including, but not limited to, the following bets, all of which were placed on or about March 23, 2023, prior to the start of the March 23 Game:

(a) Co-Conspirator 2 placed multiple straight or parlay bets on ROZIER's unders at a retail sportsbook operated by Betting Company 1 and on Betting Company 1's mobile application totaling approximately $107,000.

(b) Timothy McCormack and Long Phi Pham placed multiple straight or parlay bets on ROZIER's unders at a retail sportsbook located in New Jersey and operated by Betting Company 1 and on Betting Company 1's mobile application totaling approximately $41,000. Hours earlier, McCormack received two payments totaling approximately $40,000 via a peer-to-peer mobile payment platform that McCormack and Pham used to fund the above-described wagers on ROZIER's unders. While located within the Eastern District of New York, Pham, among other things, engaged in communications regarding and in furtherance of the fraudulent wagering scheme.

(c) Co-Conspirator 3 placed multiple straight or parlay bets on ROZIER's unders at a retail sportsbook operated by Betting Company 1 and on Betting Company 1's mobile application totaling approximately $20,000.

(d) Co-Conspirator 4 placed multiple straight bets on ROZIER's unders at a retail sportsbook operated by Betting Company 1 and on Betting Company 1's mobile application totaling approximately $17,000.

(e) Co-Conspirator 5 placed multiple straight bets on ROZIER's unders at a retail sportsbook operated by Betting Company 4 totaling approximately $12,500.

42. In addition to the defendants and their co-conspirators, others in the defendant TERRY ROZIER's close circle placed wagers on ROZIER's unders in connection with the March 23 Game. For example:

(a) Co-Conspirator 6 placed an approximately $800 bet using Betting Company 1's mobile application on ROZIER's under points. Since approximately 2022, Co-Conspirator 6 has placed dozens of bets on ROZIER's performances in various NBA games via Betting Company 1. Every one of those bets—with the exception of the under bet on ROZIER's points in connection with the March 23 Game—was an over bet. Co-Conspirator 6's bet on ROZIER's unders was successful and Co-Conspirator 6 was paid approximately $1,500 by Betting Company 1. In the days following the March 23 Game, Co-Conspirator 6 placed multiple additional bets using Betting Company 1's mobile application and lost approximately $4,000. Following that string of losses, Co-Conspirator 6 texted the defendant DENIRO LASTER, "I lost that shit on [Betting Company 1] ima give you a lite sack when I see u" and LASTER responded, "Bet."

(b) On or about the morning of March 23, 2023, a relative of LASTER created an online account with Betting Company 1 and shortly thereafter placed an approximately $4,000 parlay wager on ROZIER's unders for the March 23 Game. This wager was funded by Co-Conspirator 7—who on prior occasions in the context of discussing sports betting, had asked for and received from LASTER non-public information relating to ROZIER's health status.

43. During the March 23 Game, the defendant TERRY ROZIER removed himself from the game in the first quarter and, as planned, did not return. ROZIER played approximately nine minutes and 34 seconds, well below his season average of approximately 35.3 minutes per game. ROZIER scored five points, recorded two assists and made one three-point shot, which were all well below his per-game averages of approximately 21.1 points, 5.1 assists and 2.6 three-pointers and below the lines set by oddsmakers for ROZIER's points, assists

and three-pointers in the March 23 Game. ROZIER collected four rebounds, which was in line with his per-game average of approximately 4.1 rebounds and above the line set by oddsmakers for ROZIER's rebounds in the March 23 Game. ROZIER's early exit from the March 23 Game and his related underperformance relative to his season averages for points, assists and three-pointers resulted in the success of numerous fraudulent wagers placed on ROZIER's unders by the defendants and their co-conspirators.

44. Not all of the bets placed by the defendant TERRY ROZIER's co-conspirators were successful because ROZIER collected four rebounds, and thus went over his betting line. As a result, following the game, ROZIER and his co-conspirators negotiated to reduce ROZIER's bribe to approximately $70,000.

45. On or about March 28, 2023, Marves Fairley traveled to Philadelphia, Pennsylvania to collect proceeds from the defendant SHANE HENNEN from the successful wagers HENNEN and his associates placed on the March 23 Game, as well as proceeds from other fraudulent wagers Fairley and HENNEN made in connection with the fraudulent wagering scheme, including the March 24, 2023 NBA game described below. On or about March 28, 2023, the defendant DENIRO LASTER also traveled to Philadelphia to collect from Fairley proceeds from the fraudulent wagering scheme relating to the defendant TERRY ROZIER's performance in the March 23 Game. ROZIER arranged and paid for LASTER's flight to Philadelphia. In or about and between the late-night hours of March 28, 2023 and the early morning hours of March 29, 2023, Fairley gave LASTER tens of thousands of dollars in cash as payment for the non-public information that LASTER had obtained from ROZIER and had provided to Fairley regarding ROZIER's plan to exit prematurely from the March 23 Game.

46. After the defendant DENIRO LASTER collected his cut of the fraudulent wagering scheme proceeds from Marves Fairley, LASTER drove from Philadelphia to the defendant TERRY ROZIER's home in Charlotte, North Carolina. LASTER arrived in Charlotte on or about March 30, 2023 and met ROZIER at his home that day. During the early morning hours of April 1, 2023, LASTER and ROZIER counted the money that LASTER had obtained from Fairley in Philadelphia.

B. The March 24, 2023 Portland Trail Blazers Game

47. On or about March 24, 2023, the Portland Trail Blazers played the Chicago Bulls (the "March 24 Game"). Prior to the game, the Trail Blazers' record was 32-40 and the team was out of playoff contention with only 10 games remaining in the season. Prior to the March 24 Game, Co-Conspirator 8 told the defendant ERIC EARNEST that the Trail Blazers were going to be tanking (i.e., intentionally losing) to increase their odds of getting a better draft pick in the upcoming NBA draft. Co-Conspirator 8 told EARNEST, before the news was publicly announced, that several of the Trail Blazers' best players, including Player 1, an individual whose identity is known to the Grand Jury, would not be playing in the March 24 Game. The information that the Trail Blazers would be tanking and not playing Player 1 was not available to the public, including the Betting Companies.

48. Prior to the March 24 Game, the defendant ERIC EARNEST provided this non-public inside information to Marves Fairley so that Fairley could place fraudulent wagers on the game and share the profits with EARNEST. In exchange, Fairley ultimately promised to pay EARNEST at least $5,000 if the bets against the Trail Blazers were successful. In addition, Fairley texted EARNEST a screenshot of a purported $20,000 wire transfer from Fairley's bank account to EARNEST, accompanied by the message "Address for wire."

49. After Marves Fairley learned from the defendant ERIC EARNEST that the Trail Blazers planned not to play their best players in the March 24 Game, Fairley conveyed that non-public information to Co-Conspirator 1. Fairley and Co-Conspirator 1 agreed to split the profits on successful wagers they could place against the Trail Blazers.

50. Before these key Trail Blazers players were publicly ruled out of the March 24 Game, Marves Fairley and the defendant SHANE HENNEN, themselves and together with their co-conspirators including Co-Conspirator 1, placed and caused the placement of multiple bets that the Trail Blazers would lose the March 24 Game totaling more than approximately $100,000. For example, between approximately 12:00 p.m. EST and 7:00 p.m. EST on March 24, 2023, which was before the key Trail Blazers players were publicly ruled out, Timothy McCormack and Long Phi Pham, acting together and with Pham acting at HENNEN's direction, placed bets against the Trail Blazers of approximately $20,000 through Betting Company 1's mobile application and approximately $12,000 through Betting Company 2's mobile application.

51. The NBA injury reports publicly released at approximately 1:30 p.m. EST and 2:30 p.m. EST on March 24, 2023 reported that Player 1 was, respectively, "probable" and then "questionable" to play in the March 24 Game. At approximately 9:30 p.m. EST on March 24, 2023—approximately half an hour before the start of the March 24 Game—the NBA released an injury report listing Player 1 and others as "out" for the game. The "out" group included the Trail Blazers' four highest per-game scorers during the 2022-2023 season. The betting lines relating to the March 24 Game changed upon the public release of the Trail Blazers' key players' injury statuses.

52. The fraudulent wagers against the Trail Blazers placed and caused by Marves Fairley and the defendant SHANE HENNEN, together with co-conspirators acting at their direction were successful, as the Bulls beat the Trail Blazers 124-96.

C. The April 6, 2023 Orlando Magic Game

53. On or about April 6, 2023, the Orlando Magic played the Cleveland Cavaliers (the "April 6 Game"). Marves Fairley and Co-Conspirator 1 leveraged Co-Conspirator 1's personal relationship with one of the Magic's regularly starting players, Player 2, an individual whose identity is known to the Grand Jury, to obtain non-public information about the April 6 Game which they used to place at least one successful wager.

54. Hours before the April 6 Game, Player 2 texted Co-Conspirator 1, before the news was publicly announced, that the Magic would not be playing its entire regular starting lineup (i.e., the team's best players) in the April 6 Game. After receiving this information, Co-Conspirator 1 provided this information to Marves Fairley. At the time that Co-Conspirator 1 shared this information with Fairley, the Magic were favored to win the game by approximately nine points. Shortly thereafter, Fairley placed an approximately $11,000 wager with an unlicensed bookmaker that the Cavaliers would cover the game's spread of 9.5 points, that is, the bet would be successful if the Cavaliers won the game outright or lost the game by nine points or fewer.

55. The Magic did not play its entire regular starting lineup in the April 6 Game and the betting lines changed upon the public release of information relating to the Magic's starting lineup. The Cavaliers beat the Magic by 24 points in the April 6 Game, thus rendering Fairley and Co-Conspirator 1's fraudulent bet against the Magic successful.

D. The February 9, 2023 and January 15, 2024 Los Angeles Lakers Games

56. Damon Jones was a former NBA player and assistant coach. Jones played in the NBA from approximately 1999 through 2008, including as a member of the Cavaliers from approximately 2005 through 2008. Jones was an assistant coach on the Cavaliers from approximately 2014 through 2018. Jones was also an unofficial assistant coach on the Los Angeles Lakers during the 2022-2023 NBA season. During many of those years, Jones was a teammate or coach of a prominent NBA player ("Player 3"), an individual whose identity is known to the Grand Jury.

57. By virtue of his relationship with Player 3, the Lakers and other NBA personnel, Damon Jones had access to non-public information, including medical information that had not been released to the public. On multiple occasions during the 2022–2023 and 2023-2024 NBA seasons, including as early as approximately December 2022, Jones sold or attempted to sell for profit non-public information to others, including to the defendant ERIC EARNEST, Marves Fairley and others, for the purpose of causing or enabling them to place fraudulent wagers based on the non-public information.

58. For example, on or about February 9, 2023, the Lakers played the Milwaukee Bucks (the "February 9 Game"). On the morning of the February 9 Game, Damon Jones sent a text message to Co-Conspirator 9, writing: "Get a big bet on Milwaukee tonight before the information is out! [Player 3] is out tonight. Bet enough so Djones can eat to [sic] now!!!" At the time Jones provided this non-public information about Player 3 to Co-Conspirator 9, Player 3 was not ruled out on the NBA's injury report for the February 9 Game. Due to a lower body injury, Player 3 did not play in the February 9 Game, which the Lakers lost.

59. On multiple other occasions during the 2023-2024 NBA season, including in connection with a January 15, 2024 game between the Lakers and the Oklahoma City Thunder

(the "January 15 Game"), Damon Jones and the defendant ERIC EARNEST sold or attempted to sell to Marves Fairley non-public information for the purpose of causing or enabling Fairley to place wagers based on the non-public information. In exchange, Fairley agreed to pay Jones via EARNEST.

60. Player 4, an individual whose identity is known to the Grand Jury, was one of the Lakers' best players during the 2023-2024 NBA season. Prior to the January 15 Game, Damon Jones claimed to have learned from the trainer for Players 3 and 4 that Player 4 was injured and was only going to play a limited number of minutes and/or his performance would likely be affected in the game because of the injury. Jones shared this non-public information with the defendant ERIC EARNEST, who then sent a text message to Marves Fairley stating, "Hit me asap got one for u dude say he got some info." EARNEST then shared the non-public information about Player 4 with Fairley. Fairley paid Jones approximately $2,500, through an intermediary, via a peer-to-peer mobile payment platform, accompanied by the message: "fee."

61. After receiving this non-public information and before the January 15, 2024 game began, Marves Fairley shared the information with Co-Conspirator 1 and the defendant SHANE HENNEN. Fairley and Co-Conspirator 1 then placed and caused the placement of multiple bets against the Lakers. For example, Fairley placed an approximately $100,000 bet against the Lakers at a retail sportsbook operated by Betting Company 2. Hours before the January 15 Game, the NBA injury report listed Player 4 as "probable," and it was not publicly disseminated, including to the Betting Companies, that Player 4 would possibly play a limited number of minutes and/or poorly due to injury.

62. Ultimately, Player 4 played in the January 15 Game in line with his season average in minutes and performed well, and the Lakers won the game. After the January 15 Game, Marves Fairley requested, via the defendant ERIC EARNEST, that Damon Jones repay Fairley the $2,500 that Fairley had paid for the non-public information. Despite the Lakers winning the January 15 Game, Jones reaffirmed to EARNEST after the game, including via text message, that he had received credible non-public information regarding Player 4 prior to the game.

E. The January 26, 2024 and March 20, 2024 Toronto Raptors Games

63. On or about January 26, 2024 and March 20, 2024, the Toronto Raptors played the Los Angeles Clippers (the "January 26 Game") and the Sacramento Kings (the "March 20 Game"), respectively.

64. Prior to the January 26 Game and the March 20 Game, Jontay Porter, then a player on the Raptors, agreed with Long Phi Pham and others to exit the game prematurely, on the basis of purported injuries, so that certain of their co-conspirators could place fraudulent wagers on Porter's unders.

65. Prior to both the January 26 Game and the March 20 Game, Pham provided the non-public information about Porter to the defendant SHANE HENNEN for the purpose of causing or enabling HENNEN to place fraudulent wagers based on the non-public information. After obtaining this non-public information, HENNEN shared this information with Marves Fairley for the purpose of causing or enabling Fairley to place additional fraudulent wagers based on the non-public information. After obtaining the non-public information relating to Porter's plan to exit the January 26 Game and the March 20 Game early, HENNEN placed and directed and caused a number of his associates to place wagers on Porter's unders, all

of which were successful. HENNEN conducted multiple transfers via peer-to-peer mobile payment platforms to promote the scheme and distribute the proceeds of such wagers.

COUNT ONE
(Conspiracy to Commit Wire Fraud)

66. The allegations contained in paragraphs one through 65 are realleged and incorporated as if fully set forth in this paragraph.

67. In or about and between December 2022 and March 2024, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants ERIC EARNEST, also known as "Spook," SHANE HENNEN, also known as "Sugar," DENIRO LASTER, also known as "Niro," "Payso" and "Peso," and TERRY ROZIER, also known as "Scary Terry" and "Chum," together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud the Betting Companies, and to obtain money and property from them by means of one or more materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce writings, signs, signals, pictures and sounds, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

COUNT TWO
(Conspiracy to Commit Money Laundering)

68. The allegations contained in paragraphs one through 65 are realleged and incorporated as if fully set forth in this paragraph.

69. In or about and between December 2022 and March 2024, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the

defendants ERIC EARNEST, also known as "Spook," SHANE HENNEN, also known as "Sugar," DENIRO LASTER also known as "Niro," "Payso" and "Peso," and TERRY ROZIER, also known as "Scary Terry" and "Chum," together with others, did knowingly and intentionally conspire:

(a) to conduct one or more financial transactions in and affecting interstate commerce, which transactions in fact involved the proceeds of specified unlawful activity, to wit: (i) wire fraud, in violation of Title 18, United States Code, Section 1343 and (ii) sports bribery, in violation of Title 18, United States Code, Section 224, knowing that the property involved in the transactions represented the proceeds of some form of unlawful activity, and with the intent to promote the carrying on of the specified unlawful activity, contrary to Title 18, United States Code, Section 1956(a)(1)(A)(i);

(b) to conduct one or more financial transactions in and affecting interstate commerce, which transactions in fact involved the proceeds of some form of unlawful activity, to wit: (i) wire fraud, in violation of Title 18, United States Code, Section 1343, and (ii) sports bribery, in violation of Title 18, United States Code, Section 224, knowing that the property involved in the transactions represented the proceeds of some form of unlawful activity, and knowing that the transactions were designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership and the control of the proceeds of the specified unlawful activity, contrary to Title 18, United States Code, Section 1956(a)(1)(B)(i); and

(c) to engage in one or more monetary transactions in and affecting interstate and foreign commerce, in criminally derived property that was of a value greater than $10,000 and that was derived from specified unlawful activity, to wit: (i) wire fraud, in violation

of Title 18, United States Code, Section 1343, and (ii) sports bribery, in violation of Title 18, United States Code, Section 224, contrary to Title 18, United States Code, Section 1957(a).

(Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

COUNT THREE
(Bribery In Sporting Contests)

70. The allegations contained in paragraphs one through 65 are realleged and incorporated as if fully set forth in this paragraph.

71. In or about and between January 2023 and April 2023, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants SHANE HENNEN, also known as "Sugar," DENIRO LASTER, also known as "Niro," "Payso" and "Peso," and TERRY ROZIER, also known as "Scary Terry" and "Chum," together with others, did knowingly and willfully carry into effect, attempt to carry into effect and conspire to carry into effect, a scheme in commerce to influence, in any way, by bribery any sporting contest, with knowledge that the purpose of such scheme was to influence by bribery that contest, to wit: the March 23, 2023 Game.

(Title 18, United States Code, Sections 224, 2 and 3551 et seq.)

COUNT FOUR
(Honest Services Wire Fraud Conspiracy)

72. The allegations contained in paragraphs one through 65 are realleged and incorporated as if fully set forth in this paragraph.

73. In or about and between January 2023 and April 2023, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants SHANE HENNEN, also known as "Sugar," DENIRO LASTER, also known as "Niro," "Payso" and "Peso," and TERRY ROZIER, also known as "Scary Terry" and "Chum,"

together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud the Charlotte Hornets and NBA of the intangible right of the honest and faithful services of ROZIER through bribery and kickbacks, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures and sounds, contrary to Title 18, United States Code, Sections 1343 and 1346.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

CRIMINAL FORFEITURE ALLEGATION
AS TO COUNTS ONE, THREE AND FOUR

74. The United States hereby gives notice to the defendants that, upon their conviction of any of the offenses charged in Counts One, Three and Four, the government will seek forfeiture in accordance with Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), which require any person convicted of such offenses to forfeit any property, real or personal, constituting, or derived from, proceeds obtained directly or indirectly as a result of such offenses.

75. If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

(a) cannot be located upon the exercise of due diligence;

(b) has been transferred or sold to, or deposited with, a third party;

(c) has been placed beyond the jurisdiction of the court;

(d) has been substantially diminished in value; or

(e) has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to

seek forfeiture of any other property of the defendants up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Section 981(a)(1)(C); Title 21, United States Code, Section 853(p); Title 28, United States Code, Section 2461(c))

CRIMINAL FORFEITURE ALLEGATION
AS TO COUNT TWO

76. The United States hereby gives notice to the defendants that, upon their conviction of the offense charged in Count Two, the government will seek forfeiture in accordance with Title 18, United States Code, Section 982(a)(1), which requires any person convicted of such offense to forfeit any property, real or personal, involved in such offense, or any property traceable to such property.

77. If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

(a) cannot be located upon the exercise of due diligence;

(b) has been transferred or sold to, or deposited with, a third party;

(c) has been placed beyond the jurisdiction of the court;

(d) has been substantially diminished in value; or

(e) has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1), to seek forfeiture of any other

property of the defendants up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Sections 982(a)(1) and 982(b)(1); Title 21, United States Code, Section 853(p))

A TRUE BILL

FOREPERSON

By David Pitluck, Assistant U.S. Attorney

JOSEPH NOCELLA, JR.
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

# MINUTE ENTRY FOR ARRAIGNMENT PROCEEDING

| | | | |
|---|---|---|---|
| **MAGISTRATE JUDGE:** Lara Eshkenazi | | **DATE:** 6/10/2026 | |
| **CLERK:** D. Wright | | | |
| **DOCKET #:** 25 CR 323(LDH) | | **LOG TIME:** 2:30-2:33pm | |
| **DEFENDANTS NAME:** Shane Hennen | | | |
| _x_ Present | ___ Not Present | ___ Custody | _x_ Bail |
| **DEFENSE COUNSEL:** David Gray on behalf of Todd Leventhal | | | |
| ___ Court Appointed | ___ Federal Defender | ___ CJA | _x_ Retained |
| **A.U.S.A:** David Berman | | | |
| **INTERPRETER:** | | **LANGUAGE:** | |

Defendant arraigned on the: __ Complaint __ Indictment _x_ Superseding Indictment __ Probation Violation

| | |
|---|---|
| _x_ Defendant pleads NOT GUILTY to ALL counts. | ___ Defendants first appearance. |
| ___ Government Agent Sworn | ___ Rule 5f warnings given to the govt. |
| ___ DETENTION HEARING Held. | _x_ BAIL HEARING Held. |

___ Bond set at $

**Defendant:** __ released ___ held pending satisfaction of bond conditions.

___ Defendant advised of bond conditions set by the Court and signed the bond.

___ Surety/ies sworn, advised of bond obligations by the Court and signed the bond.

___ (Additional) surety/ies to co-sign bond by ______________________

___ After hearing, Court orders detention in custody. ___ Leave to reopen granted.

| | |
|---|---|
| ___ Order scheduling a Detention Hearing entered. | ___ Bail Hearing set for ______________ |
| ___ Preliminary Hearing set for | ___ Preliminary Hearing waived by defendant |

___ At this time, defense counsel states on the record that the defendant does not have a bail application / package. Order of detention entered with leave to reapply to a Magistrate Judge or to the District Court Judge to whom the case will be assigned.

| | | |
|---|---|---|
| ___ Order of Excludable Delay/Speedy Trial entered. | Start Date: | End Date: |
| **Removal District:** | **Removal District Case Number:** | |

___ Removal (Rule 5) Proceeding held.

| | |
|---|---|
| ___ Identity hearing held | **Court:** ___ Orders removal ___ Denies Removal |
| ___ Defendant waives Identity hearing | ___ Defendant waives Preliminary hearing |

___ No bail application presented to the court. Commitment to the District entered.

___ Medical memo issued.

___ Defendant failed to appear; bench warrant issued.

_x_ Status conference set for **6/10/2026** @ **3:30pm** before District Judge: DeArcy Hall

**Other Rulings:** Defendant arraigned on the superseding indictment; bond continued.

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

KTF/BW/DIB
F. #2024R00288

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

August 21, 2026

By E-mail and ECF

The Honorable LaShann DeArcy Hall
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re: United States v Eric Earnest, et al.
Criminal Docket No. 25-323 (LDH)

Dear Judge DeArcy Hall:

The government writes to respectfully request that Your Honor issue an order (the "Order") directing the Clerk of Court to release to the government the records it has received pursuant to a trial subpoena issued by the government in connection with the above-captioned case. The government further requests that the Order apply both to records already received by the Clerk of Court and, prospectively, to any additional records subsequently received by the Clerk of Court pursuant to trial subpoenas issued by the government in connection with the

above-captioned case. Upon receipt of any such records, the government will promptly produce them to the defense in accordance with its discovery obligations.

Respectfully submitted,

JOSEPH NOCELLA, JR.
United States Attorney

By: /s/ David I. Berman
Kaitlin T. Farrell
Benjamin Weintraub
David I. Berman
Assistant U.S. Attorneys
(718) 254-7000

cc: Clerk of Court (LDH) (by ECF and E-Mail)
Counsel of Record (by ECF)

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

JPL:KTF/BW/DIB
F. #2024R00288

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

September 8, 2026

By E-Mail and ECF

The Honorable LaShann DeArcy Hall
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re: United States v. Shane Hennen
Criminal Docket No. 25-323 (LDH)

Dear Judge DeArcy Hall:

We respectfully write to inform the Court that the United States Attorney's Office for the Eastern District of New York has initiated the transfer of the defendant Shane Hennen's above-captioned case to the Eastern District of Pennsylvania pursuant to Rule 20 of the Federal Rules of Criminal Procedure.[1] The transfer will facilitate Mr. Hennen's entry of a global guilty

[1] On January 14, 2026, a grand jury sitting in the Eastern District of Pennsylvania returned an indictment charging, among others, the defendant Shane Hennen in connection with a fraudulent sports gambling scheme. See United States v. Smith, et al., No. 26-CR-023 (E.D. Pa.) (the "EDPA Case").

plea pursuant to a plea agreement and sentencing in consolidated proceedings in the Eastern District of Pennsylvania in connection with both the above-captioned case and the EDPA Case.

Respectfully submitted,

JOSEPH NOCELLA, JR.
United States Attorney

By: *David I. Berman*
Kaitlin T. Farrell
Benjamin Weintraub
David I. Berman
Assistant United States Attorneys
(718) 254-6167

cc: Clerk of Court (LDH) (by ECF)
Counsel of Record (by ECF)